**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

THE STATE OF NEW YORK,
DENISE SHEEHAN AS COMMISSIONER OF THE NEW
YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, AND
THE NEW YORK STATE ENERGY RESEARCH AND
DEVELOPMENT AUTHORITY

Plaintiffs,

v.

THE UNITED STATES OF AMERICA

and

SAMUEL BODMAN, SECRETARY
U.S. DEPARTMENT OF ENERGY

Defendants.

## COMPLAINT

### INTRODUCTION

1.     Plaintiffs bring this action against the United States, seeking cost recovery,

damages and declaratory relief regarding the cleanup of the Western New York Nuclear Service

Center at West Valley in Cattaraugus County, New York ("Center" or "Site"). As a part of the

federal government's early atomic energy program, and to spur commercial nuclear power, the

federal government promised commercial atomic energy producers that it would meet their fuel

reprocessing needs. (Reprocessing removes the reusable portion of fuel from spent nuclear waste

and prepares the rest for long-term storage and disposal.) To address these needs and because

then-existing federal government facilities could not handle commercial atomic waste, the federal

government assisted in the creation of the Center, at which Nuclear Fuel Services, Inc. ("NFS"), a

private company, reprocessed spent nuclear fuel shipped to the Site by both federal defense and

commercial nuclear facilities from 1966 to 1972. The federal government made available to NFS

and the State its expert staff as well as classified technological information developed from the federal defense program, and was the sole beneficiary of the uranium and plutonium recovered by reprocessing activities. In reliance on the federal government's assertion that a perpetual care fund to be paid by Site customers would be sufficient for the perpetual care of nuclear wastes, and in furtherance of the federal government's program to create incentives for a private atomic energy industry, New York agreed to assume responsibility for long-term care of the nuclear wastes stored and disposed of at the Site.

2.      NFS ceased operations in 1972, leaving behind several disposal landfills, lagoons, contaminated buildings, and 600,000 gallons of high level radioactive waste ("HLRW") generated by reprocessing activities. Much of this waste will remain radioactive for tens of thousands of years and the "perpetual care" fund turned out to be wholly inadequate to address the long-term care of the nuclear wastes remaining at the Center after the cessation of the NFS operation. At the direction of Congress, the United States Department of Energy ("DOE") carried out an HLRW management demonstration project at the Center, solidifying the HLRW and preparing it for off-site disposal at a site to be developed for such wastes by the federal government. Pursuant to this federal program, New York pays ten per cent of the cost of the demonstration project -- the only state in the country to contribute to the cost of managing HLRW generated in conjunction with spent nuclear fuel reprocessing undertaken on behalf of the United States. The United States has yet to open a disposal facility to which such solidified HLRW can be sent for long-term storage or disposal.

3.      Plaintiffs seek judicial relief under three federal statutes: the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601, *et seq.* ("CERCLA"); the West Valley Demonstration Project Act, Pub. L. 96-368 ("WVDPA"); and the

2

Nuclear Waste Policy Act, 42 U.S.C. §§ 10101–10270 ("NWPA"). Under CERCLA, New York seeks recovery of the costs it has incurred and will incur in responding to releases and threatened releases of hazardous substances (including radionuclides) at and from the Site, as well as compensation for damages to the State's natural resources. Under the WVDPA, the State seeks a ruling that the DOE's obligation to decontaminate and decommission all facilities, hardware and materials includes the obligation to decontaminate and decommission all of the facilities, hardware and materials specified in this complaint; to maintain, repair or replace and monitor any hardware, tank or other facility containing any radioactive substance for so long as such hardware, tank or other facility remains at the Center in order to ensure that decontamination and decommissioning standards continue to be met at the Center; and to respond to releases and/or migration of any radioactive substance from such facilities and hardware whenever such migration occurs if such response is required in order to attain or maintain compliance with decontamination and decommissioning standards. Pursuant to the NWPA, New York seeks a ruling that the HLRW at the Center results from atomic energy defense activities and, therefore, the United States, not New York, must pay the cost of disposing those wastes at the HLRW repository developed by the federal government pursuant to the NWPA.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b), or in the alternative, 5 U.S.C. § 704, and has authority to issue declaratory judgment relief and further appropriate relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 703. Plaintiffs have a right to bring this action pursuant to CERCLA, the NWPA and the WVDPA, or, alternatively 5 U.S.C. § 702. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 9613(b).

**PARTIES**

5.      Plaintiffs include the State of New York; Denise Sheehan, Commissioner of the New York State Department of Environmental Conservation ("NYSDEC"); and the New York State Energy Research and Development Authority ("NYSERDA"). Plaintiff State of New York is a sovereign state of the United States of America. It brings this action on its own behalf and to protect natural resources held in trust by the State. The Attorney General of New York is authorized to prosecute this action pursuant to Article 63 of the New York Executive Law.

6.      Plaintiff Denise Sheehan is the Commissioner of the NYSDEC, an agency of the State of New York charged with protecting the environment and natural resources of the State pursuant to the Environmental Conservation Law of the State of New York ("ECL"). The Commissioner is the designated trustee of the State's natural resources pursuant to section 107(f)(2)(B) of CERCLA, 42 U.S.C. § 9607(f)(2)(B).

7.      Plaintiff NYSERDA is a public benefit corporation created by the New York State Legislature in 1975 to, *inter alia*, manage the Center on behalf of the State, and, beginning in 1995, to coordinate the State's activities on nuclear energy matters. NYSERDA holds the title to land that comprises the Center on behalf of the State of New York.

8.      NYSERDA is responsible, on behalf of the State, for undertaking appropriate and necessary action at those portions of the Center within its possession in order to protect public health and safety. NYSERDA's activities at the Center are funded by monies appropriated by the New York State Legislature.

9.      The citizens of New York have been and continue to be adversely affected and aggrieved by the acts and omissions of the Defendants as alleged herein.

4

10.     Defendant Samuel Bodman is named solely in his official capacity as the Secretary of the DOE. In that capacity, he is responsible for the administration, operations and activities of the DOE, including compliance with the WVDPA and compliance with and implementation of the NWPA.

11.     Defendant United States of America ("United States"), a sovereign nation, is responsible, *inter alia*, for the management of hazardous substances and materials owned, possessed or used by it and its constituent departments and agencies and its employees, contractors and agents.

## FACTS

### General Description of the Site

12.     The Center consists of approximately 3300 acres located mostly in the Town of Ashford in Cattaraugus County, about 30 miles southeast of Buffalo, New York.

13.     The Center is located within the glaciated portion of a geologic formation known as the Appalachian Plateau. Underlying the Center is an ancient bedrock valley filled with approximately 500 feet of glacial deposits. The United States Environmental Protection Agency designated the Cattaraugus Creek Basin Aquifer System, including the Center, as a sole source aquifer; that is, an aquifer supplying at least 50% of the drinking water for the area overlying the aquifer.

14.     NFS operated a nuclear waste reprocessing facility at the Center from 1966 to 1972. The former reprocessing building and two closed radioactive waste disposal areas remain at the Center. In addition, the Center has a high-level radioactive waste tank farm, waste lagoons, above ground radioactive waste storage areas, radioactive waste processing areas, underground radioactively contaminated piping, and various levels of soil and groundwater contamination in

5

and around these facilities. Much of this waste will remain radioactive for tens of thousands of years.

15.     The reprocessing building, tank farm, waste lagoons, radioactive waste storage areas and a radioactive waste disposal area known as the Nuclear Regulatory Commission-Licensed Disposal Area ("NDA"), are located on a central portion of the Site, approximately 200 acres in size, managed by DOE (the "Project Premises"). NYSERDA, on behalf of the State, currently manages approximately 3,100 acres of largely vacant land used as a buffer zone within the Center, and the State-Licensed Disposal Area ("SDA"), which covers approximately 16 acres (the "Retained Premises"). The Project Premises and the SDA are surrounded by a chain-link fence and entry on to these areas is restricted. The Project Premises will revert to NYSERDA upon completion of DOE's responsibilities under the WVDPA. Exhibit A consists of a map of the Center showing the Retained Premises, the Project Premises and the various creeks that flow through the Center.

16.     Deep cutting creeks delineate two plateaus within the Project Premises. These plateaus are referred to as the North Plateau--containing the reprocessing building, waste lagoons, tank farm and related facilities--and the South Plateau containing the SDA, the NDA, and above ground waste storage facilities.

17.     Quarry Creek defines the northern boundary of the North Plateau and Frank's Creek defines the southern border of the South Plateau and the eastern borders of both the North Plateau and the South Plateau. Erdman Brook divides the two plateaus. Quarry Creek, Frank's Creek and Erdman Brook flow into the deeply cut Buttermilk Creek which bisects the Center. Buttermilk Creek flows into Cattaraugus Creek, which flows off the Center in a southwesterly direction to Lake Erie.

6

18.     The Center is subject to erosion. Quarry Creek, Frank's Creek and Erdman Brook are eroding glacial deposits as they flow through glacial till into Buttermilk Creek. The North and South plateaus around the Center are being modified through sheet erosion from running water, stream downcutting, slope movement and gully migration. Erosion processes, if left unmitigated, will control the volume and rate of contamination release into creeks. Because of the susceptibility of the Site to erosion and the proximity of nearby creeks to the SDA and the NDA, unless regular monitoring, repairs and preventive measures are taken to control erosion, materials buried in those areas will be exposed in the future.

The Role of the United States in the Development and Operation of the Center

19.     In the early 1950s, the United States Atomic Energy Commission ("AEC") promised the operators of commercial power reactors that the AEC would meet their reprocessing needs at AEC facilities at firm prices until 1967, unless private reprocessing capacity was established before then. However, the federal government recognized that absent participation by private industry, it would have to construct and operate one or more reprocessing plants and attendant facilities to take care of the projected volume of spent nuclear fuel produced by utilities, as existing government facilities were not designed to process spent fuels from commercial power reactors. Thus, in 1954 the AEC began a program to encourage private nuclear waste reprocessing.

20.     In 1956, then AEC Chairman, Lewis Strauss, announced a formal program to encourage private industry to enter into chemical reprocessing of spent nuclear fuel. In order to generate interest by private industry, the AEC offered to make AEC technology developed for the defense program available to assist with the commercialization of reprocessing of spent nuclear fuel. The AEC also committed to provide a certain amount of spent fuel for reprocessing, stating

7

that it would provide a base load for economical operation of one or more commercial chemical reprocessing plants until such time as the volume of spent fuel from private power reactors was sufficient to support the private reprocessing plant(s).

21.     In direct response to the AEC's efforts to introduce private industry into the nuclear fuel cycle, in 1956 New York created the Council on Development of Atomic Energy, which, in 1959, became the Office of Atomic Development ("OAD"). The OAD was established as an independent agency within the State Executive Department to coordinate the regulatory and development functions of the agencies of the State and its political subdivisions, and to engage directly in certain expressly authorized developmental and service projects. The OAD shortly thereafter was authorized to acquire land for long-term storage (by burial) of radioactive wastes created by various activities undertaken by industrial, commercial, medical and research entities.

22.     In 1961, in remarks before the Institute of Nuclear Materials Management, the AEC's Director for the Office of Industrial Participation reiterated AEC's support of private industry, indicating that the AEC stood "prepared to provide information and every reasonable support" in the development of commercial reprocessing facilities.

23.     While actively encouraging private industry to develop nuclear fuel reprocessing capabilities, the AEC also established criteria upon which to evaluate proposals for the licensing of reprocessing facilities. The criteria included, among other things, evidence that satisfactory arrangements could be made to process the fuels from at least one operator of a privately-owned reactor.

24.     The OAD acquired land on June 20, 1961 for industrial development involving the use of radioactive materials and the storage of nuclear wastes in compliance with the AEC regulations requiring that nuclear waste storage sites be owned by either the federal government

8

or a state. Fourteen additional acres in the Town of Concord, Erie County, were added to the Site on March 4, 1963 for radiation control and monitoring purposes. The entire combined parcel became the Western New York Nuclear Service Center.

25. Beginning in 1961, AEC representatives met with the OAD and other New York State agencies multiple times to advise and consult with the State regarding the possibility of having a commercial reprocessing operation at the Center. At these meetings, the AEC representatives shared information concerning technology and other relevant topics with New York State representatives.

26. The New York State Atomic Research and Development Authority ("NYSARDA"), a public benefit corporation, was established on April 1, 1962 pursuant to the New York State Atomic Research and Development Authority Act. The creation of NYSARDA was an outgrowth of the developmental activities of the OAD. The initial mission of NYSARDA was to assume responsibility for the specific developmental and service projects previously undertaken by the OAD, and to carry these projects forward. The projects included the Center. (Later, in 1975 the newly created NYSERDA assumed NYSARDA's responsibilities for the Center.)

27. By 1962, the AEC and NYSARDA were engaged in discussions concerning the possibility of locating the country's first commercial reprocessing facility in New York. The AEC and NYSARDA also discussed issues ranging from federal competition in the reprocessing business to regulatory oversight of the proposed facility. Specifically, NYSARDA sought assurances from the AEC regarding, among other things, limiting the federal government's role as a reprocessor following private industry's entrance into the business. The AEC provided such assurances in a letter to NYSARDA Chairman Oliver Townsend.

9

28. New York's initial expectation was that it would only provide the land needed for the reprocessing operation. However, the AEC insisted that a state agency be responsible for long-term care of the wastes stored and disposed of at any commercial reprocessing facility. New York agreed to take on this responsibility, largely in reliance on the AEC's assertion that a perpetual care fund to be funded by payments made by the operator's customers, including the AEC, would be sufficient for the perpetual care of such wastes.

29. The funding levels for the perpetual care fund were based on the intention to provide enough money to defray the State's costs for perpetual human surveillance and maintenance, financial protection against property damage and liability, and replacement of the waste tanks approximately every 40 years for so long as replacement would be required. The AEC viewed the waste tanks as storage units that would require long-term maintenance.

30. During approximately the same time that the federal and state governments were discussing a commercial reprocessing center in New York, New York also solicited expressions of interest from the private sector to develop and operate the Center, including the proposed low radioactivity waste burial facility.

31. Of the companies responding to New York's invitation for expressions of interest, the company demonstrating the most well-developed and substantial plans for an activity compatible with the proposed State-owned waste management facilities was the Davison Chemical Co., a division of W. R. Grace & Co. In 1959 in response to AEC's invitations to the private sector, this company, together with five utilities, had formed the "Industrial Reprocessing Group". In 1960 or 1961, W. R. Grace & Co. created a new subsidiary, Nuclear Fuel Services, Inc. ("NFS") to continue the project.

10

32.    Negotiations between New York (first through OAD and, after April 1962, NYSARDA) and the Davison Chemical Co. (and, after 1961, NFS) led to the execution of an agreement in 1962 between NYSARDA and NFS. Under the agreement, NFS agreed to apply for a license from the AEC to construct and operate a nuclear fuel reprocessing plant and the waste burial facilities at the Center, and NYSARDA agreed to lease the Center to NFS.

33.    At about the same time, in 1962, NFS also entered into agreements with NYSARDA and AEC to construct and operate the commercial reprocessing plant at West Valley for spent nuclear fuel.

34.    Staff from several federal agencies, including the AEC, assisted New York in the development of the Center and provided previously classified technological information. The information and opinions provided by the federal agencies, including their recommendations and proposals, were included in the license application submitted to the AEC. In addition, when New York and NFS entered into their original agreements, they relied on the AEC for advice and recommendations as to the necessary provisions for financial and institutional responsibility.

35.    In July 1962, NFS filed a license application with the AEC. In January 1963, NYSARDA filed a separate but related license application with the AEC. A license to construct the reprocessing plant was issued by the AEC in 1963.

36.    During the site selection approval process, the Hazards Evaluation Branch of the AEC was in frequent contact with the staff of the New York OAD and NYSARDA and their consultants.

37.    On or about October 15, 1962, the AEC and New York entered into an agreement regarding the termination of certain regulatory authority over low-level radioactive waste burial facilities located in New York. As a result of that agreement, the AEC relinquished its regulatory

11

authority over the operation of the low radioactivity waste burial facility at the Center, while retaining authority over the construction of the higher-radioactivity waste burial facility at the Center (now called the Nuclear Regulatory Commission-Licensed Disposal Area or "NDA").

38.     The low-radioactivity waste burial facility at the Center, known today as the State-Licensed Disposal Area ("SDA"), began to receive waste in 1963. The burial area accepted low-radioactivity waste from the reprocessing plant, as well as from federal, institutional, educational, medical, industrial and commercial radioactive waste sources and nuclear power plants.

39.     As promised to industry, the AEC agreed to provide NFS, during the first five years of its operations, a base load of irradiated nuclear fuel for reprocessing at the Center. On or about September 16, 1963, the AEC and NFS entered into the Base Load Contract.

40.     Under the Base Load Contract, the AEC had the right to, and did, maintain a staff at the facility to observe activities of interest to the AEC and to ensure that AEC-approved procedures were properly followed in all processing operations affecting the plant's accountability measurements, which served as the basis for the financial arrangements among the parties.

41.     Up until 1964, under federal law, all "special nuclear material" as defined by the Atomic Energy Act was owned by the federal government. In 1964, Congress enacted the Private Ownership of Special Nuclear Materials Act ("Private Ownership Act"), that provided for the transfer of ownership of this special nuclear material from the federal government to private utilities. The transition period specified for this transfer was August 26, 1964 to June 20, 1973. As a result, the federal government owned most, if not all, of the radioactive materials sent to NFS for reprocessing.

12

42.     In or about 1966, the construction of the Center reprocessing plant was completed, and the AEC issued NFS and NYSARDA, as co-licensees, a license for the reprocessing of spent nuclear fuel and the operation of radioactive waste management facilities. The AEC license authorized NFS, *inter alia*, to operate the facility, possess and use the nuclear material and byproduct materials, and to dispose of the solid radioactive waste by burial on-site. The technical specifications of the operating license imposed additional requirements, including limits on the release of radioactivity via the plant stacks and radioactive liquid effluent via discharges from the lagoon system into the surrounding surface waters.

43.     In or about 1966, NFS began reprocessing spent fuel. The reprocessing operation was shut down in 1972 by NFS. Spent fuel reprocessing operations never resumed.

## Federal Sources of Material Reprocessed at the Center

44.     Approximately 480 metric tons of spent nuclear fuel were supplied to NFS by the AEC under the Base Load Contract. Of the 480 metric tons, 380 metric tons came from the federal government's N-Reactor, a plutonium production reactor at AEC's Hanford Reservation. The remaining 100 metric tons supplied by the AEC came from two commercial reactors. The remainder of the spent fuel reprocessed by NFS came to NFS as a result of other contracts, but it was spent fuel that the federal government previously had obligated itself to reprocess in the absence of a commercial reprocessing capability. Thus, the United States, either directly or indirectly, arranged for the reprocessing of all of the spent fuel reprocessed at the Center.

45.     NFS also entered into contracts with various federal entities, including the U.S. Army, for the burial of waste at the Center. The contracts with the U.S. Army included disposal of radioactive wastes in the burial grounds and the decontamination of Army trucks transporting such waste from the Watertown Arsenal to NFS.

13

46.    Other facilities connected to the federal government from which NFS received radioactive waste include the Knolls Atomic Power Laboratory, which is or was operated for the DOE; one or more Veterans Administration hospitals; the Argonne National Laboratory, which is or was operated by the University of Chicago for DOE; the Brookhaven National Laboratory, which was founded under the oversight of the AEC and with initial research funding from the AEC; and Edgewood Arsenal, a U.S. Army installation. These wastes received by NFS were buried in the SDA.

47.    Not only was the federal government a primary source of the spent fuel reprocessed and disposed of at Center, the United States was the beneficiary of the plutonium and uranium recovered through spent fuel reprocessing.

48.    As a result of NFS' operations, 1,926 kilograms of plutonium were recovered. Almost 80 percent (1,530 kilograms) of the reprocessed plutonium was shipped to AEC's Hanford Reservation. Of the 1,530 kilograms of plutonium received by the AEC from NFS, 635 kilograms originated from fuel or reactors that were AEC-owned (534 kilograms came from Hanford's N Reactor), and 895 kilograms came from commercial power reactor fuel. Most of the remaining plutonium was also shipped to federal facilities.

49.    As part of its efforts to reduce America's dependency on foreign supplies of natural uranium, the federal government also sought to acquire recycled uranium from the Center. Uranium was critical to the operation of nuclear reactors and the production of weapons, but it was a scarce resource. As a result, the recovery of uranium from spent fuel became a priority to the federal government.

50.    The Center processed 27 batches of nuclear fuel during its six years of operation. This reprocessing involved approximately 625 Metric Tons Uranium ("MTU") of spent fuel and

14

resulted in the recovery of approximately 622 MTU, of which approximately 359 MTU were recovered from fuel that originated from federal reactors, and the remainder was recovered from commercial electrical power reactors. Of the 622 MTU recovered, 621 MTU were shipped to Fernald, a DOE facility in Ohio with uranium processing plants. At Fernald, the material was used for conversion to compounds for use within the DOE complex. The remaining 1 MTU was shipped to Y-12, a federally-owned manufacturing facility formerly called the Oak Ridge Y-12 Plant, which was part of the Manhattan Project.

51.   Solid wastes from federal facilities, which were not considered to be higher-radioactivity wastes, were buried in the SDA. Solid radioactive wastes from NFS' reprocessing operations were buried in the NDA and SDA.

## Nuclear Fuel Services Operations

52.   The Center reprocessing facility was designed to process several different types of spent nuclear fuel as there was not a sufficient volume of a single type of fuel to support the operation of the facility. The NFS facility consisted of a main Process Building and independent support facilities, including utilities buildings, a plant warehouse, a maintenance shop, an office building annex and a gatehouse. The Process Building, which included approximately 70 rooms and cells, is arranged in a U shape with the Fuel Receiving and Storage Area at one end and the purified product removal facilities at the other. In the middle are the mechanical and chemical process cells. Each of these cells is adjacent to and shares a common wall with the next cell in sequence. NFS also used a lagoon system for wastewater management, including wastewater treatment, and the burial grounds for disposal of radioactive materials and substances.

15

## Spent Nuclear Fuel Reprocessing Process

53.     The spent nuclear fuel reprocessing process consisted of mechanical disassembly and chopping, nitric acid dissolution, solvent extraction processing, evaporation, neutralization and liquid waste storage in underground tanks.

54.     The spent nuclear fuel reprocessing operations began when the fuel was received, by rail and by truck, at the Fuel Receiving and Storage Area. The spent fuel was transported in shipping casks that were specified by the AEC. The casks, railroad cars and trailers were washed down. The casks were then placed in a 44-foot deep cask unloading pool, where the spent fuel assemblies were removed from the casks and then loaded into storage cans. The empty casks were removed from the pool and placed in a decontamination stall for cleanup and preparation for return shipment.

55.     The fuel assemblies were transferred via storage can to the Process Mechanical Cell, where fuel rods were chopped into short segments and transferred via fuel baskets to the Chemical Processing Cell. The chopped fuel segments were then placed in dissolver tanks containing boiling nitric acid. Once the fuel was dissolved and separated from the metal cladding, the solutions were put through a solvent extraction process that separated out the fission products and recovered uranium and plutonium in nitrate solutions. The solution containing fission products was transferred to the high-level waste evaporator for concentration and the recovery of nitric acid for reuse. The concentrated fission product solution was neutralized and transferred to a 750,000 gallon underground carbon-steel storage tank.

56.     The contracts between NFS and its customers and the contract between the AEC and NFS provided that NFS would perform a cleanout of the plant before NFS began to process

16

another customer's shipment(s). During the cleanout period, all plant systems were operative in order to properly flush out the plant and to process the "cleanout" solutions.

57.    During NFS' six years of operation, the reprocessing operation generated approximately 2.3 million liters (approximately 600,000 gallons) of concentrated fission product solution, a high-level liquid radioactive waste, from the extraction of uranium and plutonium from spent nuclear rods.

58.    Although this high-level liquid radioactive waste will remain radioactive for tens of thousands of years, the expected useful life of the high-level radioactive waste carbon steel storage tanks is only 40 to 50 years.

<u>Hazardous and Mixed Wastes from Fuel Reprocessing</u>

59.    NFS used various chemicals in the spent fuel recovery processing, the cleaning and decontamination activities undertaken after each customer's lot was processed, and in the analytical chemistry laboratory and maintenance facilities. Various volatile organic compounds, acids, bases, metals and other chemicals were used. For example, trichloroethylene was used as a degreaser in the maintenance facilities.

60.    The reprocessing of spent nuclear fuels at the Center generated several types of waste. The wastes were stored or disposed of at the Center. For example, the leached fuel cladding, once separated from the fuel, was buried in the NDA along with other higher-radioactivity solid radioactive wastes originating from acid leaching during the fuel reprocessing. Neutralized higher-radioactivity waste consisting of alkaline supernatant, in liquid form, and sludge from the PUREX (Plutonium/Uranium Extraction) fuel reprocessing operations was held in a 750,000 gallon underground steel storage tank, which is enclosed within a reinforced concrete vault structure. Higher-radioactivity wastes from THOREX (Thorium Extraction) fuel

17

processing activities were sent to a 13,500 gallon tank that is located in a separate underground concrete vault. The byproducts of the reprocessing process that exhibited lower levels of radioactivity also were disposed of at the Center. The liquid byproducts were sent through the liquid waste stream management system, while the solid wastes were buried in the SDA.

61.     The main sources of low-radioactivity liquid effluents during NFS' operations were the low-activity fraction from the acid recovery system, which contained dilute acids and traces of fission products, as well as various decontamination washdowns, solvent washers, laundry wastewaters and wastes from the Process Building and utility room floor drains, and laboratory drains. The liquid effluents were collected in the interceptors, which were concrete holding tanks, and released into the lagoon system through underground pipes.

62.     At the outset of NFS' operations, the wastewater from the interceptors was released into storage lagoons, which consisted of three separate lagoons in series with a total capacity of 5,000,000 gallons. The wastewater was released from the lagoon system to Cattaraugus Creek via Erdman Brook. The AEC initially specified discharge limits based on concentrations to be monitored in Cattaraugus Creek. When the Low-Level Waste Treatment Building was added in 1971, two additional lagoons were added. At this point, the AEC established concentration limits at the point of discharge from the lagoons, in addition to the concentration limits for Cattaraugus Creek.

63.     After construction of the Low-Level Waste Treatment Building, wastewaters were routed to Lagoon 1 (until it was closed) and then to Lagoon 2 before being sent to the treatment component of the Low-Level Waste Treatment Building. After treatment, the wastewater was routed to Lagoon 4 or Lagoon 5 for sampling and then, depending on the radioactivity of the

18

wastewater, to Lagoon 3 for release to Cattaraugus Creek via Erdman Brook. Liquid that was not released to Erdman Brook was returned to the treatment system.

64.     The Process Building had a ventilation system designed to control airborne radioactivity. The gaseous effluents from the plant processes consisted of ventilating air with radioactive particulates, gaseous tritium and water vapor containing tritium and the noble gases contained in the irradiated fuel.

65.     The Process Building's ventilation system which exhausted through one stack included four components. The Dissolver Off-Gas system used scrubbers and filters to treat gaseous effluents from the dissolver and shearing operations. The Vessel Off-Gas Filter also used filters and scrubbers to treat gaseous effluents from process vessels throughout the Process Building. The Waste Tank Off-Gas system condensed and filtered gaseous effluents from the high-level waste storage tanks. Finally, the Main Ventilation System controlled the passage of air in the Process Building from clean areas to successively more contaminated areas before filtering air prior to discharge up the stack.

66.     Higher-radioactivity solid wastes were buried in the NDA, which is located approximately 1,200 feet southeast of the Process Building and covers an area of approximately 5.1 acres. The NDA consists of 237 holes that received materials contaminated with higher-activity wastes, including, but not limited to, highly contaminated fuel assembly structural materials and filters, discarded contaminated equipment and vehicles, and discarded material from the solvent extraction process that was absorbed within a porous material, such as kitty litter, and then containerized.

19

67.    In April 1969, with AEC approval, NFS buried 42 ruptured fuel assemblies in the NDA. The fuel assemblies were buried because they could not be reprocessed. The fuel originated from AEC's New Production Reactor at the Hanford facility.

68.    Solid radioactive wastes that were not considered to be higher-radioactivity wastes were buried in the SDA. The trenches were opened as needed and then covered as they filled with lower-activity radioactive waste. Water held in the lagoons associated with the SDA was discharged into Erdman Brook or seeped into the surrounding soils. Subsequent to 1971, water from the SDA lagoons was transferred to the Low-Level Waste Treatment Facility lagoons. In March 1975, following a burial trench overflow incident, the SDA lagoons were used to hold excess liquids pumped from the completed trenches.

69.    The unlined 10-acre construction and demolition debris landfill, located northeast of the Process Building, received solid waste, construction and demolition debris, miscellaneous steel and boiler parts, tires, incinerator ash, boiler blowdown, paint cans, batteries, and maintenance shop waste during NFS operations. Groundwater samples near the landfill indicate the presence of radionuclides and other hazardous substances.

### West Valley Demonstration Project

70.    In 1980, Congress passed the WVDPA, directing the DOE to carry out a high-level radioactive waste management demonstration project at the Center ("Demonstration Project").

71.    The House Science and Technology Committee Report accompanying the WVDPA states that the purpose of the project is "to carry out an integrated production scale research, development and demonstration project utilizing the alkaline and acidic high-level liquid nuclear wastes" at the Center. H. Rep. No. 96-1100, pt. 1, at 4 (1980). The report also indicates that the "major benefit from the project will accrue to the Federal Government and the

20

national nuclear waste policy program through advancement of research and development of handling, processing, solidification, and decommissioning techniques for high-level nuclear waste." *Id.* at 8.

72.     Representative Wydler stated on the floor of the House that through the WVDPA, the "Department of Energy is turning the problem of existing wastes at West Valley into the advantage of generally demonstrating the removal and solidification of liquid high-level wastes on a meaningful scale. This is an appropriate intermediate state in the program evolution toward building expensive, full-scale facilities. Thus, this project . . . is truly research, development, and demonstration." 126 Cong. Rec. 25,354 (Sept. 15, 1980).

73.     The DOE echoed these statements. DOE Secretary Worthington C. Bateman stated in a letter to the House Committee on Science and Technology that "[t]he West Valley project represents a logical next step towards the larger facility that we are planning for immobilizing the defense high-level wastes at Savannah River," and noted that DOE intended to manage the project as a "technology and defense waste operating program . . . . , " H. Rep. No. 96-1100, pt. 1, at 13-14.

74.     The goals of the Demonstration Project from the DOE's perspective include demonstration of technology for the solidification of alkaline and acid thorium-based wastes on a significant scale; demonstration of technology for the decontamination, decommissioning and disposal of high-level radioactive waste storage tanks; providing operational experience in the removal of sludge from high-level waste tanks; and development of methodologies for assessing the environmental impact of, and developing safety criteria for, other high-level waste solidification projects.

21

75.     The WVDPA requires the Secretary of Energy to enter into an agreement with
New York State for carrying out the Demonstration Project, and allocates 10 percent of the
Project costs to New York and 90 percent of Project costs to the federal government. Under this
arrangement, NYSERDA has provided approximately $200 million toward completion of the
Demonstration Project.

76.     Section 2(a)(5) of the WVDPA requires DOE to "decontaminate and
decommission": the tanks and other facilities at the Center in which the high-level radioactive
waste was stored prior to solidification under the Demonstration Project; the facilities used in the
solidification of the waste; and any material and hardware used in connection with the
Demonstration Project.

77.     The WVDPA also requires New York to "make available" to the DOE the
facilities at the Center and the high-level radioactive waste for use in the Demonstration Project.

78.     In October 1980, the DOE and NYSERDA signed the "Cooperative Agreement
between the United States Department of Energy and the New York State Energy Research and
Development Authority on the Western New York Nuclear Service Center at West Valley New
York" (the "Cooperative Agreement"). The Cooperative Agreement states that the
Demonstration Project is to include all activities undertaken to solidify the liquid high-level
radioactive wastes at the Center, including, without limitation, the "decontamination and
decommissioning of the tanks, other facilities at the Center in which the solidified wastes were
stored and all Project Facilities and other facilities, material, and hardware used in carrying out
the solidification of the high-level radioactive wastes at the Center."

22

## Facilities Used by the DOE for the Purposes of the WVDPA

79.     Pursuant to the Cooperative Agreement, the DOE has taken possession of and is

using all of the land defined as the "Project Premises" in the Cooperative Agreement, including

all surface water thereon and groundwater thereunder, and has taken possession of and has used

or is using all of the facilities and equipment located on the "Project Premises," including but not

limited to the following "Project Facilities": (i) the Fuel Receiving and Storage Area, (ii) the

Process Plant, also known as the Process Building, (iii) the High-Level Waste Tank Farm Area,

(iv) the Low-Level Waste Treatment Building used for processing aqueous waste from the

Process Plant and the waste burial areas, including the flocculator/clarifier, the centrifuge, filters,

ion exchange system, the neutralizer, the pumps, pipes, tanks, ventilation system and related

fixtures, machinery, equipment, installations or apparatus affixed thereto or installed in

connection therewith, (v) the holding ponds and lagoons, pumps, pipelines, and associated

equipment for the storage and/or treatment of aqueous radioactive effluents from the Low-Level

Waste Treatment Building, (vi) interceptors or storage pools constructed of concrete and/or

concrete and stainless steel used for temporary storage of radioactive aqueous effluents from the

Process Plant, (vii) the above-ground storage area for the weathering, decay and temporary

storage of equipment and materials, (viii) the burial area licensed by the NRC, (ix) the "Utility

Room Building," "Utility Service Facilities," "Service Distribution Systems," the "Warehouse,"

"Maintenance Shops," and the "Laundry" as defined in Exhibit C to the Cooperative Agreement,

(x) all paved and unpaved improved roadways, parking lots and walkways providing access or

that provided access during any portion of the Demonstration Project to any structure, area or

equipment used by the DOE; and (xi) all radioactive material and waste located or stored on the

Project Premises.

23

80.    DOE also has used or is using, in carrying out the Demonstration Project, all of the facilities set forth in Exhibit D of the Cooperative Agreement, including, but not limited to, (i) the Water Supply and Discharge, (ii) the Railroad Spur, (iii) the Environmental Laboratory, and (iv) Environmental Monitoring facilities.

81.    The DOE constructed a weapons or gun range outside the chain link fence at the Center. The DOE has agreed that the gun range, which it used for training of security personnel, is a "facility" used by the DOE for the purposes of the WVDPA.

82.    From 1982 to 1987, as part of the Demonstration Project, the DOE decontaminated cells and rooms in the Process Building at the Center in order to prepare them for reuse during the Demonstration Project. DOE also constructed and used new structures, including but not limited to, the Vitrification Facility (used to convert liquid high-level waste from the high-level waste storage tanks into borosilicate glass), and the Cold Chemical Facility and the Load In/Load Out Facility, which were used to support vitrification and other waste management activities.

83.    The High-Level Waste Tank Farm Area includes the underground waste storage tanks and supporting systems for maintenance, surveillance, and waste transfer of the high-level waste to the Vitrification Facility. As part of the Demonstration Project, the DOE modified the two larger tanks in the tank farm to support high-level waste treatment and vitrification operations. The High-Level Waste Transfer Trench was built and used by DOE to convey treated and untreated HLRW between the Tank Farm and various treatment systems such as the Vitrification Facility, the Cement Solidification system and the Low-Level Waste Treatment System. The High-Level Waste Transfer Trench also has been used and/or is being used by the DOE in conjunction with the Demonstration Project.

24

84. Waste storage facilities were constructed by the DOE to store low-level and transuranic wastes generated from Demonstration Project activities. These facilities include the Lag Storage Building; Lag Storage Additions 1, 3, and 4 (used for temporary onsite storage of waste); the Interim Waste Storage Facility; the Chemical Process Cell Waste Storage Area; the Radwaste Treatment System Drum Cell; above-grade concrete vaults; and hazardous waste storage facilities.

85. Since at least 1988, the Liquid Waste Treatment System has been used to process the low-level fraction of the supernatant and sludge wash solutions, as well as the melter-feed preparation stream condensates and vessel and equipment flushing solutions that were generated by the DOE during the vitrification of high-level waste. The Liquid Waste Treatment System produces a distillate waste stream and a radioactive concentrates stream.

86. The lagoon system receives treated wastewater from the Demonstration Project, including wastewater from the NDA interceptor trench, the groundwater pump-and-treat system, several yard drains located outside the Process Building, and the tank farm dewatering well. Currently Lagoon 2 discharges to the updated water treatment facility, which in turn discharges to Lagoons 4 and 5 for sampling, and then depending on the radioactivity of the wastewater to Lagoon 3, ultimately into the outfall to Erdman Brook. Liquid not released to Erdman Brook is returned to the treatment system.

87. Portions of the NDA have been used by the DOE to dispose of solid radioactive wastes resulting from the Demonstration Project. DOE also used the construction and demolition debris landfill for disposal of non-radioactive wastes between 1982 and 1984.

## Releases and Threatened Releases from the Center

88.     During NFS' operations, the acid recovery equipment used to separate and transport acids for reuse during reprocessing leaked approximately 200 gallons of recovered acid contaminated with strontium and cesium. Eventually, the contamination made its way through drains and into the plant's sewer system, including the Erdman Creek sewer outfall where it was found during routine AEC compliance inspections. The release or releases were not permitted under any license or permit held by NFS or any other entity.

89.     The leaks from the acid recovery equipment also entered the groundwater and spread, creating a source of the 15-acre North Plateau Groundwater Plume, which contains strontium-90 and other hazardous substances. The Plume discharges into surface water flowing through the Center.

90.     Each of the lagoons at the Center contains soil contamination as a result of releases of liquids containing hazardous substances, including radionuclides, to each lagoon. Each lagoon is a source of groundwater contamination. In 1972, Lagoons 4 and 5 overflowed their banks and in 1974, those lagoons were identified as potential sources of tritium releases to the groundwater and subsequently were lined. The releases were not in compliance with the terms of NFS' AEC license or any other license or permit.

91.     Lagoon 1 was removed from service in 1984. At that time, the DOE excavated contaminated material from Lagoon 1 and placed it in Lagoon 2. Lagoon 1 was filled with radiological debris from the Old Hardstand (a paved asphalt pad that was used to store radioactive equipment) and capped with clay and topsoil. Leaching from Lagoon 1 has been identified as a source of a plutonium, strontium and tritium groundwater plume that is moving in the direction of Erdman Brook. The leaching constitutes an unpermitted release.

26

92.     Operations around the unlined interceptor resulted in strontium-90 contamination in the surrounding soils and groundwater. These releases into the surrounding soils and groundwater were not permissible or authorized under any license or permit.

93.     Spent filter media and ion exchange resin from the water treatment area were collected in the resin pit, an in-ground concrete vault located outside the southeastern corner of the Fuel Receiving and Storage Area. Resin and filter media spilled within and outside of the resin pit, resulting in cesium and strontium contamination in the soil and the groundwater. These releases were not permissible or authorized under any permit or license issued for the Center.

94.     The underground waste water transfer lines and process waste transfer lines in and around the process buildings leaked during operations, resulting in soil and groundwater contamination. The storage of heavy shipping casks and washing of process equipment resulted in releases of contaminants to the soil around the Old Hardstand asphalt storage pad. The releases were not permissible or authorized under any license or permit.

95.     In 1968, the air filters designed to reduce the release of radioactive gaseous effluents failed on at least three occasions. On or about September 4, 1968, an unknown quantity of radioactive material was discharged through the stack when a filter in the vent exhaust cell ruptured, was pulled through the blower, and discharged through the stack. The filter failures are the main source of a greater than 1.5 mile-long area of cesium soil contamination that begins at the Process Building stacks and continues northwest through the Site and off-site. The releases were not in compliance with NFS' AEC license or authorized under any other permit or license.

96.     In 1975, the burial trenches at the SDA overflowed and excess water was pumped into adjacent lagoons. Later that year, one of the lagoons overflowed, resulting in a release of between 6,000 and 8,000 gallons of untreated trench water into the environment. Seepage from

27

the lagoons also resulted in contamination of surrounding soils and surface waters. Characterization of SDA trench water in 1994 indicates the presence of numerous hazardous substances, including, but not limited to, acetone, benzene, 1,4 dioxane, arsenic and chromium. None of the releases described above were permissible or authorized under any license or permit.

97.     The soil contamination resulting from the SDA lagoon overflows and seepages have resulted in contaminants being flushed into surface water ravines to the east of the NDA.

98.     In the early 1990s, the DOE detected water contaminated with tributyl phosphate, n-dodecane and several radionuclides, including plutonium-239, downgradient of the NDA. In 1991, the DOE installed an interceptor trench designed to collect the contaminated surface water and send it to the Low-Level Waste Treatment Facility.

99.     Hazardous constituents are associated with materials buried in the NDA. Hazardous chemicals disposed of in the NDA include fuel reprocessing chemicals, solvents used for decontamination, paint removers and paint residues. In 2003, the DOE found elevated beta levels in the swale at a parking lot outside the northeast slope, indicating that the NDA's holes are overflowing.

100.     NFS began a groundwater monitoring program at the Center in 1974 to find the source of tritium discovered in groundwater. NFS also took surface water samples and air samples as required by its AEC license. In 1982, the DOE began an environmental sampling program. As a result of these activities and other assessment activities, releases of hazardous substances to groundwater, surface water, surrounding soils and air have been documented. Among the hazardous substances that have been detected are various radionuclides, metals, and various solvents including 1,1,1-trichloroethane and 1,1-dichloroethane.

28

101. As a result of releases and threatened releases of hazardous substances into the environment at the Center, NYSERDA has incurred and is incurring response costs. NYSERDA has incurred at least $1.4 million in response costs to date.

102. NYSERDA has taken and is taking response actions, including but not limited to: SDA groundwater monitoring activities; monitoring of radiation levels in surface waters and the air; weekly and monthly inspections of facilities in which the hazardous substances are contained; annual repairs to the SDA geomembrane cover; taking and analyzing environmental samples; and radiation contamination level monitoring.

DOE's Responsibilities Under the West Valley Demonstration Project Act

103. Section 1856 of the New York Public Authorities Law authorizes NYSERDA to take such actions as it deems necessary or appropriate with respect to the Center.

104. NYSERDA, as an NRC license holder for the Center, has a decommissioning responsibility for the Center, as does the DOE. NYSERDA and the DOE are co-permittees under the hazardous waste program administered by the NYSDEC. Thus, NYSERDA may, in addition to the actions taken by the DOE, have to undertake closure activities at the Center. Prior to taking any such decommissioning or closure actions, NYSERDA must comply with the New York State Environmental Quality Review Act (New York Environmental Conservation Law Article 8). The statute requires a state agency to assess the impact of the actions it intends to take on the environment. The statute specifically requires the relevant agency to certify that the state agency's action will avoid or minimize adverse environmental effects to the maximum extent practicable.

105. NYSERDA and the DOE do not agree as to the scope of the DOE's obligation under the WVDPA to decontaminate and decommission. As a consequence, it is impossible for

29

NYSERDA to identify the decommissioning and closure actions it is likely to take at the Center. Therefore, NYSERDA cannot undertake informed budgetary planning or make appropriate decisions in connection with actions it may have to take at the Center.

106. During the Demonstration Project, the DOE has used and is using the "Project Premises," as that term is defined in the Cooperative Agreement, and all of the facilities, equipment, containers, and tanks described in Paragraphs 79-87 above.

107. The DOE has taken the position that it does not have an obligation under the WVDPA to decontaminate and decommission all of the tanks, facilities, hardware and material described in paragraphs 79-87 above.

108. The DOE has stated that its obligation to decontaminate and decommission does not include the obligation to monitor any radioactive materials and contaminated media exhibiting radioactivity or any structures or units used by the DOE which contain radioactive materials if, as part of the DOE's decommissioning program, such materials, contaminated media, structures or units will remain at the Center. Such monitoring is necessary in order to ensure that the decontamination and decommissioning standards continue to be met.

109. The DOE has stated that its obligation under the WVDPA to decontaminate and decommission does not include the obligation to undertake actions to respond to the release and/or migration of radioactive substances after it implements its decontamination and decommissioning program. Such actions may be necessary in order to ensure that the decontamination and decommissioning standards continue to be met.

110. Several of the radioactive substances that are stored or disposed of at the Center will remain a threat to public health and the environment for tens of thousands of years due to the long half-lives of the substances. As long as those substances remain at the Center, the

30

equipment, tanks and structures that contain them must be monitored, maintained and repaired on a periodic basis. Likewise any such contaminants migrating away from the Center must be monitored.

111.    Over the course of the Demonstration Project, NYSERDA and the DOE have engaged in discussions concerning the scope of the DOE's obligation under the WVDPA to decontaminate and decommission.

112.    By letter dated February 5, 2002 to William M. Flynn, President of NYSERDA, Under Secretary of Energy Robert G. Card stated that the WVDPA does not require the DOE to provide for the long-term surveillance and stewardship of the premises and facilities that it took possession of, if the agency leaves radioactive waste or materials entombed at the Site as part of its decommissioning program.

113.    If the DOE does not have a legal obligation to undertake or provide for monitoring and other appropriate long-term stewardship activities, NYSERDA must now design a plan to provide the requisite funding for such activities.

114.    The costs associated solely with monitoring the high-level waste tanks for thousands of years could exceed the total amount of money that has been spent to date by the DOE and NYSERDA during the Demonstration Project.

115.    Therefore, it is critical for NYSERDA to determine, with finality, as soon as practicable whether the WVDPA imposes a long-term stewardship obligation on the DOE and the scope of that obligation.

116.    Section 8(b)(2) of the NWPA renders the United States responsible for paying the fees required by Section 302 of the Act relating to the placement of high-level radioactive wastes resulting from atomic energy defense activities in the repository developed by the federal

31

government pursuant to the NWPA. Currently, the DOE is in the process of studying a site at Yucca Mountain in Nevada for such a repository.

117.    There were several meetings with DOE representatives in the 1990s in which the disposal fee issue was discussed. Ultimately, as part of a settlement proposal addressing several issues, the federal government agreed that it would be responsible for paying the fees associated with placing the high-level radioactive materials at the Center in the repository to be developed and operated by the federal government pursuant to the NWPA.

118.    In his February 5, 2002 letter, Undersecretary of Energy Card stated categorically that, in direct conflict with the position of the prior Administration, New York, not DOE, is responsible for paying the fee associated with placing the Center's high-level radioactive materials at the Center in any repository to be developed and operated by the federal government pursuant to the NWPA. This represents a complete reversal of the DOE's prior willingness to assume responsibility for that fee.

119.    The federal government's current estimate of the disposal fee is greater than $228 million with interest accruing. The interest will not stop accruing until the fee is paid.

120.    Given the current and ever-increasing amount of the disposal fee, New York must begin the process of providing a mechanism to provide monies to pay the disposal fee if the fee is indeed the State's obligation. Therefore, it is crucial to New York that the legal issue of which entity is responsible for paying the disposal fee be decided as soon as possible.

## CLAIMS FOR RELIEF

### First Cause of Action

#### CERCLA Response Costs

121.    The United States owned the material sent to the Center from military facilities

32

and other facilities managed by or on behalf of the United States. In addition, because federal law

limited private ownership of much nuclear waste from commercial facilities, the United States

owned most, if not all, of the radioactive materials sent to the Center for reprocessing.

122. The United States arranged, by contract, agreement or otherwise, for the disposal

of hazardous substances, owned or possessed by the United States and by other entities, at the

Center.

123. The United States arranged, by contract, agreement or otherwise, for the treatment,

by way of reprocessing, of hazardous substances, owned or possessed by the United States and by

other entities, at the Center.

124. The Center is a "facility" for purposes of CERCLA. The Center is the repository

of hazardous radioactive and non-radioactive substances. The Center presently is contaminated

as a result of various operations undertaken at the Center by NFS and the DOE. Hazardous

substances have been and are being released into the environment at the Center, including the

surrounding soils, groundwater, and surface waters, from various structures, surface

impoundments (including lagoons), containers, and the burial areas.

125. As a consequence of the climate and topography of the Center, there is a high

probability that the physical structures that contain hazardous substances will deteriorate over

time if they are not maintained and/or replaced. Deterioration of the structures will result in the

release of hazardous substances, including radioactive hazardous substances, into the soils,

groundwater and surface waters.

126. As a consequence of the releases and threatened releases at the Center, the State,

by virtue of actions undertaken by NYSERDA or its contractor, has incurred response costs not

33

inconsistent with the National Contingency Plan, 40 C.F.R Part 300 *et seq.*, totaling at least $1.4

million, associated with various response actions it has undertaken and is undertaking at the
Center.

127.    The State will continue to incur costs associated with monitoring and responding
to releases and threatened releases of hazardous substances into the environment at the Center.

128.    Pursuant to CERCLA, the State is entitled to reimbursement by the United States
of its response costs, including response costs incurred in the future.

## Second Cause of Action

### CERCLA Natural Resource Damages

129.    The release of hazardous substances into the environment at the Site has caused
injury to, destruction of and/or loss of the natural resources of New York within the
meaning of sections 101(16) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(16) and 9607(a),
including soil, groundwater, surface water, and wetlands.

130.    Based on the acts set forth above, Defendants are liable to the State for damages
due to injury to, destruction of, and/or loss of soil, groundwater, surface water, wetlands and other
natural resources of the State, and for reasonable costs of assessing such injury, destruction or
loss resulting from the releases of hazardous substances.

## Third Cause of Action

### Declaration Concerning the Responsibilities of the DOE
### under the West Valley Demonstration Project Act

131.    Section 2(a)(5) of the WVDPA requires the DOE to decontaminate and
decommission: (a) the tanks and other facilities in which high-level radioactive waste was stored

34

prior to solidification; (b) the facilities, including but not limited to tanks, used during the Demonstration Project; and (c) any material and hardware used during the Demonstration Project.

132.    During the Demonstration Project, the DOE has used and/or is using the Project Premises (including but not limited to tanks), hardware and material listed in paragraphs 79-87 of this Complaint and, as a consequence, has an obligation under Section 2(a)(5) of the WVDPA to decontaminate and decommission each of them.

133.    The options that the DOE is considering for decommissioning the Center include options whereby high-level radioactive substances will remain at the Center. One such option entails leaving the high-level radioactive waste tanks and their associated vaults at the Center. The tanks continue to contain some high-level radioactive wastes despite extraction and solidification of liquid high-level radioactive wastes from the tanks.

134.    The DOE's obligation under Section 2(a)(5) of the WVDPA to decontaminate and decommission includes the obligation to maintain, repair or replace and monitor any hardware or facility (including but not limited to any tank) containing radioactive substances, and to monitor any material containing any radioactive substances for as long as that material, hardware, or facility remains at the Center in order to ensure that the decontamination and decommissioning standard(s) continue to be met at the Center.

135.    DOE's obligation under Section 2(a)(5) of the WVDPA to decontaminate and decommission includes the obligation to take action to ensure that the decontamination and decommissioning standard(s) for the Center continue to be met if there is a release of a contaminant, pollutant, hazardous substance or toxic material or substance from hardware, a tank, or other facility used during the WVDPA, irrespective of when such a release occurs.

35

### Fourth Cause of Action

### Declaration as to the Obligation of the United States With Respect to the Disposal Fee Required by the Nuclear Waste Policy Act

136.    The NWPA requires the payment of a fee to the Nuclear Waste Fund by all entities, federal, state, local, or private, that intend to transfer high-level radioactive waste or spent nuclear fuel to the repository managed by the DOE pursuant to the NWPA.

137.    Section 2(a)(3) of the WVDPA requires the DOE to transport the high-level radioactive waste solidified during the Demonstration Project to the federal high-level radioactive waste repository created pursuant to the NWPA.

138.    The high-level radioactive waste at the Center is high-level radioactive waste resulting from atomic energy defense activities.

139.    Section 8(b)(2) of the NWPA imposes on the federal government the obligation to pay the costs related to the disposal of high-level radioactive waste resulting from atomic energy defense activities, including any fees required by Section 302 of the NWPA.

### Prayer for Relief

WHEREFORE, the State respectfully requests this Court to grant the following relief:

1.    Declare that the United States is liable under CERCLA to the State for response costs incurred and being incurred in connection with investigating, monitoring and responding to the releases and threatened releases of hazardous substances into the environment at the Center and for damages to natural resources resulting from the release of hazardous substances, pollutants and contaminants into the environment at the Center.

36

2.    Declare that the United States is liable under CERCLA to the State for any response costs it incurs in the future relating to releases and threatened releases of hazardous substances at or from the Center.

3.    A judgment requiring the Defendants to compensate the State for all past, present and future injury to, destruction of, or loss of soil, groundwater, surface water, wetlands, and other natural resources of the State, including the reasonable costs of assessing such injury, destruction or loss

4.    A judgment requiring the United States to reimburse the State for all response costs incurred in connection with actions taken as of the date of this Court's order in response to the hazardous substance contamination at and migrating from the Center.

5.    Declare that the DOE has an obligation under the WVDPA to decontaminate and decommission all of the Project Premises, including all surface water thereon and groundwater thereunder, and all Project Premises, facilities (including but not limited to tanks), hardware and materials referred to in paragraphs 79-87 of this Complaint and any other Project Premises, hardware, material, tank or other facility located at the Center that it used during the Demonstration Project.

6.    Declare that DOE's obligation under the WVDPA to decontaminate and decommission includes the obligation to maintain, repair or replace and monitor any hardware, tank or other facility containing radioactive substances and to monitor any material containing any radioactive substance for as long as that material, hardware, tank or other facility remains at the Center in order to ensure that the decontamination and decommissioning standard(s) continue to be met at the Center.

7.     Declare that DOE's obligation under the WVDPA to decontaminate and decommission includes the obligation to take action to ensure that the decontamination and decommissioning standard(s) for the Center continue to be met if there is a release at or from the Center of a contaminant, pollutant, hazardous substance, or toxic substance from a tank or other facility or any hardware used during the WVDPA, irrespective of when such release occurs.

8.     Declare that pursuant to Section 8(b)(2) of the NWPA, 42 U.S.C. § 10107(b)(2), the United States is responsible for paying any fees or costs due under the NWPA in connection with the placement of any high-level radioactive materials from the Center in the federal repository established under the NWPA for high-level radioactive waste and spent nuclear fuel.

Dated: December 11, 2006

ELIOT SPITZER
Attorney General of the
State of New York
The Capitol
Albany, New York 12224

By:     _____
        DAVID A. MUNRO
        (518) 474-8481
        LINDA E. WHITE
        (716) 853-8466
        Assistant Attorneys General
        Environmental Protection Bureau

AKIN GUMP STRAUSS HAUER & FELD LLP

By:     _____
        SHEILA D. JONES
        1333 New Hampshire Ave N.W.
        (202) 887-4000
        Washington D.C. 20036
        Attorneys for NYSERDA

38