**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al.,      )<br><br>           **Plaintiffs,**   )<br><br>      - v -            )<br><br>UNITED STATES OF AMERICA, et al.,   )<br><br>          **Defendants.**   )  )  ) | **No. 06-CV-810** |

**CONSENT DECREE**

WHEREAS, the State of New York (the "State") is the owner of approximately 3,340 acres of property in Cattaraugus County, New York, known as the Western New York Nuclear Service Center (the "Site");

WHEREAS, the New York State Energy Research and Development Authority ("NYSERDA") holds title to the Site on behalf of the State of New York and operates a portion of the Site;

WHEREAS, the Site has been used since approximately 1962 for various purposes involving the processing, treatment and storage of nuclear fuel and radioactive waste;

WHEREAS, from 1962 until 1975, Nuclear Fuel Services, Inc., ("NFS"), a private business, conducted nuclear fuel reprocessing and radioactive waste disposal activities on the Site;

WHEREAS, in 1980, Congress enacted the West Valley Demonstration Project Act ("WVDPA"), Pub. L. 96-368, providing that the United States Department of Energy ("DOE") shall conduct a demonstration project known as the West Valley Demonstration Project (the "Project") on approximately 200 acres of the Site (the "Project Premises");

WHEREAS, since 1982, DOE has conducted the Project at the Site, and has engaged in the vitrification and storage of certain liquid high level radioactive waste left at the Site by NFS;

WHEREAS, NYSERDA and DOE have each taken actions already to decontaminate the

Site and remediate the release or threatened release of hazardous substances at the Site;

WHEREAS, the State, NYSERDA, and DOE are engaged in certain public processes, including a process to develop an Environmental Impact Statement pursuant to the National Environmental Policy Act and the State Environmental Quality Review Act, to determine the appropriate steps to be taken in the remediation and decommissioning of the Site;

WHEREAS, on December 13, 2006, the State, NYSERDA, and the New York State Department of Environmental Conservation ("NYSDEC"), as plaintiffs, served upon the United States and the Secretary of DOE a Complaint in this case, alleging certain claims under the WVDPA, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607; and the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10107;

WHEREAS, the United States has not yet asserted, but could allege, counterclaims under CERCLA or other statutes against one or more of the plaintiffs identified in the Complaint;

WHEREAS, the Parties, as defined herein, seek to resolve certain claims without further litigation, prior to discovery and the taking of testimony, and without any admission of fact or law;

WHEREAS, the Court, by entering this Consent Decree, finds that the Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, it is ORDERED and ADJUDGED:

## PARTIES

1.    The parties to this Consent Decree are the State, NYSDEC, and NYSERDA (collectively, "Plaintiffs"); and the United States of America, DOE, and Steven Chu, as Secretary of DOE (collectively, the "United States"). The State, NYSDEC, NYSERDA, the United States of America, DOE, and the Secretary of DOE are collectively referred to herein as the "Parties."

## JURISDICTION

2.    The Court has jurisdiction to enter this Consent Decree pursuant to 28 U.S.C. § 1331 and CERCLA, 42 U.S.C. § 9613(b).

## DEFINITIONS

3.    The following definitions apply to the capitalized terms in this Consent Decree:

*Complaint* means the Complaint filed in this case, No. 06-cv-810, in the Western District of New York, and served upon the United States on December 13, 2006.

*Cooperative Agreement* means the Cooperative Agreement effective October 1, 1980, as amended September 18, 1981, between DOE and NYSERDA.

*Effective Date* means the date upon which this Consent Decree is entered by the Court.

*Future Remedy Costs* means Remedy Costs incurred by any Party on or after the Effective Date of this Consent Decree.

*High-Level Radioactive Waste* means any waste defined as "high-level radioactive waste" by the Nuclear Waste Policy Act, 42 U.S.C. § 10101(12) or by Section 6(4) of the WVDPA.

*Interim End State Activities* means any of the actions described in Exhibit A, entitled "Interim End State Activities."

*Lagoons* means any or all of the structures listed on Exhibit B, entitled "Lagoons."

*Main Process Building* means the multi-story building in which NFS conducted operations to recover uranium and plutonium from irradiated nuclear fuel from 1966 to 1971.

*Main Process Plant* means any of the structures listed on Exhibit C, entitled "Main Process Plant."

*Mixed Source Contaminated Soils* means those soils, including contaminated hardstands composed of gravel covered soil, that are contaminated as the result of operations at the Site by both the United States and by NFS and/or Plaintiffs, excluding any soils that are contaminated solely due to exposure to groundwater in the North Plateau Groundwater Plume or solely due to exposure to the Lagoons. All known areas of soil contamination listed on Schedule D(1) of the attached Exhibit D, entitled "Soils," shall be considered Mixed Source Contaminated Soils.

*NFS Contaminated Soils* means those soils, including contaminated hardstands composed of gravel covered soil, that are contaminated solely as the result of NFS or Plaintiffs' operations at the Site, excluding any soils that are contaminated solely due to exposure to groundwater in the North Plateau Groundwater Plume or solely due to exposure to the Lagoons. All known areas of soil contamination listed on Schedule D(2) of the attached Exhibit D, entitled "Soils," shall be considered NFS Contaminated Soils.

*North Plateau* means the portion of the Site between Quarry Creek and Erdman Brook that is identified on the map attached as Exhibit E.

*North Plateau Groundwater Plume* means a zone of radiologically contaminated soil and groundwater that extends northeastward from the Main Process Building, containing Strontium-90 and Yttrium-90 as the principal radionuclides. As of the Effective Date of this Consent Decree, the North Plateau Groundwater Plume is approximately 500 meters long and 200 meters wide, but the term "North Plateau Groundwater Plume" as used on this Consent Decree includes the entire extent of the contaminated zone, including any areas to which radionuclides might migrate after the Effective Date of this Consent Decree.

*NRC-Licensed Disposal Area* ("*NDA*") means the radioactive waste disposal area on the South Plateau, measuring approximately 122 meters by 183 meters, and ancillary structures including an interceptor trench, liquid pretreatment system structures, a leachate transfer line, and a former lagoon, as identified in the attached Exhibit F.

*Past Remedy Costs* means Remedy Costs incurred or paid by any Party prior to the Effective Date of this Consent Decree.

*Project Contaminated Soils* means those soils, including contaminated hardstands composed of gravel covered soil, that are contaminated solely as the result of Project operations at the Site, excluding any soils that are contaminated solely due to exposure to groundwater in the North Plateau Groundwater Plume or solely due to exposure to the Lagoons. All known areas of soil contamination listed on Schedule D(3) of the attached Exhibit D, entitled "Soils," shall be considered Project Contaminated Soils.

*Project Costs* means costs incurred by the United States that are necessary to carry out the Project or otherwise meet the requirements of Section 2 of the WVDPA.

*Project Structures* means those facilities and areas at the Site that are listed on Exhibit G, entitled "Project Structures."

*Remedy Action* means:

a.  Any action carried out by any Party to address threats to human health or the environment at the Site, including actions carried out pursuant to CERCLA, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.,* or Article 27, Title 9 of the New York State Environmental Conservation Law, and including any monitoring and maintenance activities that are incorporated as part of any remedy selected for any facility covered by Paragraphs 13 through 32 of this Consent Decree; provided that such an action meets the definition of "removal," "remedy," or "remedial action" under CERCLA § 101(23) or § 101(24) and is not inconsistent with the National Contingency Plan, 40 C.F.R Part 300; and provided that a waiver of sovereign immunity exists with respect to the United States' liability for such an action; or

---

> b.  Any action to "decontaminate and decommission" the Site within the meaning of WVDPA § 2(a)(5).

*Remedy Costs* means any direct or indirect "costs of removal or remedial action" within the meaning of CERCLA § 107(a)(4)(A), any "necessary costs of response" within the meaning of CERCLA § 107(a)(4)(B), or any cost incurred by a Party in the course of performing a Remedy Action as described in this Consent Decree.

*Source Area* means the source of the groundwater contamination in the North Plateau Groundwater Plume, as identified on the attached Exhibit H.

*South Plateau* means the portion of the Site between Erdman Brook and Frank's Creek that is identified on the map attached as Exhibit E.

*State-Licensed Disposal Area* ("*SDA*") means an area of approximately 15 acres that includes radioactive waste disposal trenches, three filled lagoons and two waste storage buildings, including tanks and piping, as identified on the attached Exhibit J.

*Supplemental Agreement* means the Supplemental Agreement to the Cooperative Agreement, effective October 1, 1990, between DOE and NYSERDA.

*Underground Piping* means any pipe buried beneath the surface soil within the boundary of the Site.

*Waste Tank Farm* means any or all of the structures listed on Exhibit K, entitled "Waste Tank Farm."

<u>SCOPE OF CONSENT DECREE</u>

4.  This Consent Decree shall not extend to or inure to the benefit of any person, entity or organization other than the Parties, and nothing in this Consent Decree shall be construed to make any person, entity or organization not executing this Consent Decree a third-party beneficiary to this Consent Decree.

5.  This Consent Decree pertains only to the apportionment between the Parties of the Remedy Costs arising from or in connection with certain Remedy Actions that may be conducted by the Parties.

6.  The provisions of the Cooperative Agreement and the Supplemental Agreement shall remain in full force and effect, except to the extent such provisions are inconsistent with or superseded by this Consent Decree, in which case this Consent Decree shall be given effect.

---

7.     Nothing in this Consent Decree shall be construed to require any Party to select or carry out any particular Remedy Actions or to advocate the selection of any particular Remedy Actions.

## COST ALLOCATION

### General Provisions

8.     The provisions of Paragraphs 13 through 32 shall apply to all Future Remedy Costs incurred by any Party for any Remedy Action covered by the enumerated "Cost Allocation" provisions below.

9.     The provisions of Paragraphs 13 through 32 shall not apply to any Past Remedy Costs incurred by any Party at the Site.

10.    No Plaintiff shall be entitled to seek recovery of any Past Remedy Costs from the United States, and the United States shall not be entitled to seek recovery of any Past Remedy Costs from any Plaintiff, except that this Consent Decree shall not affect DOE's right to seek recovery from Plaintiffs of 10 percent of any Project Costs pursuant to the WVDPA, including any Past Remedy Costs, to the extent such Project Costs are not otherwise allocated between the Parties as Remedy Costs under this Consent Decree.

11.     The United States shall be responsible for the payment of any obligations that are allocated to any of the parties defined as the United States under this Consent Decree, subject to the provisions of Paragraph 56.  Nothing in this Consent Decree shall be interpreted as: (a) limiting the United States' ability to direct by any lawful means (including, if necessary, appropriate legislation) which of its departments, agencies, or public authorities shall satisfy any of the United States' obligations under this Consent Decree; (b) preventing a party other than the United States from paying any obligations that are allocated to any of the parties defined as the United States under this Consent Decree; or (c) affecting the rights, duties, obligations and liabilities between and among any of the parties defined as the United States under this Consent Decree.

12.    The State shall be responsible for the payment of any obligations that are allocated to any Plaintiff under this Consent Decree, subject to the provisions of Paragraph 57.  Nothing in this Consent Decree shall be interpreted as: (a) limiting the State's ability to direct by any lawful means (including, if necessary, appropriate legislation) which of its departments, agencies, or public authorities shall satisfy any of Plaintiffs' obligations under this Consent Decree; (b) preventing a party other than the State from paying any obligations that are allocated to any of the parties defined as Plaintiffs under this Consent Decree; or (c) affecting the rights, duties, obligations and liabilities between and among any of the parties defined as Plaintiffs under this Consent Decree.

<u>State-Licensed Disposal Area</u>

13.     For any Remedy Action related to the SDA, the United States shall bear 30 percent of
        any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs
        shall bear 70 percent of such Future Remedy Costs.

<u>NRC-Licensed Disposal Area</u>

14.     For any Remedy Action related to the NDA that is an Interim End State Activity, the
        United States shall bear 90 percent of any Future Remedy Costs incurred as a result of
        those Remedy Actions, and Plaintiffs shall bear 10 percent of such Future Remedy Costs.

15.     For any Remedy Action related to the NDA that is not an Interim End State Activity, the
        United States shall bear 50 percent of any Future Remedy Costs incurred as a result of
        such Remedy Actions, and Plaintiffs shall bear 50 percent of such Future Remedy Costs.

<u>Main Process Plant</u>

16.     For any Remedy Action related to the Main Process Plant, the United States shall bear 90
        percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and
        Plaintiffs shall bear 10 percent of such Future Remedy Costs.

17.     The following possible Remedy Actions, if they are selected, shall be considered subject
        to the "Main Process Plant" allocation described in Paragraph <u>16</u>:

        a.      Demolition of the slab and below-ground cells of the Main Process
                Building, including any associated removal and disposal of the demolition
                debris;

        b.      Cutting off the underground pilings associated with the Main Process
                Building; and

        c.      Movement of any canisters of High-Level Radioactive Waste from the
                Main Process Building to a temporary storage area on the Site, and any
                construction and storage costs related thereto.

        Notwithstanding the provisions of this Paragraph, if demolition and removal of the Main
        Process Building is conducted as a Remedy Action, then the United States shall bear 50
        percent of any Future Remedy Costs incurred as a result of any soil removal and disposal
        that may be incidental to the demolition and removal of the Main Process Building, and
        Plaintiffs shall bear 50 percent of such Future Remedy Costs.

Project Structures

18.     For any Remedy Action related to Project Structures, the United States shall bear 90 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 10 percent of such Future Remedy Costs.

19.     Notwithstanding the provisions of Paragraph 18, if demolition and removal of any Project Structures is conducted as a Remedy Action, then the United States shall bear 50 percent of any Future Remedy Costs incurred as a result of any soil removal and disposal that may be incidental to the demolition and removal of such Project Structures, and Plaintiffs shall bear 50 percent of such Future Remedy Costs.

North Plateau Groundwater Plume

20.     For any Remedy Action related to the North Plateau Groundwater Plume, the United States shall bear 50 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 50 percent of such Future Remedy Costs.

21.     The following possible Remedy Actions, if they are selected, shall be considered subject to the "North Plateau Groundwater Plume" allocation described in Paragraph 20:

        a.      Any Interim End State Activities related to the North Plateau Groundwater Plume;

        b.      The removal of the Source Area of the North Plateau Groundwater Plume;

        c.      The extraction and treatment of contaminated groundwater within the North Plateau Groundwater Plume;

        d.      Any measures selected to retard the spread of contamination due to the movement of groundwater in or from the North Plateau Groundwater Plume;

        e.      Monitoring of the North Plateau Groundwater Plume; and

        f.      The exhumation or treatment of soils that are contaminated solely due to exposure to groundwater in the North Plateau Groundwater Plume.

Lagoons

22.     For any Remedy Action related to the Lagoons, the United States shall bear 90 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 10 percent of such Future Remedy Costs.

23.    The allocation of costs stated in Paragraph 22 applies only to the Lagoon structures as defined in Exhibit B. For any Remedy Actions related to the excavation of soil that is under the Lagoons or is adjacent to the Lagoons, but that is not part of the Lagoon structures as defined in Exhibit B, the United States shall bear 50 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 50 percent of such Future Remedy Costs.

Soil Contamination

24.    For any Remedy Action related to contaminated soil at the Site that is not otherwise addressed in this Consent Decree, the allocation of Future Remedy Costs between the parties for such Remedy Actions shall be as follows:

    a.    For any Remedy Action related to Project Contaminated Soils, the United States shall bear 90 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 10 percent of such Future Remedy Costs.

    b.    For any Remedy Action related to Mixed Source Contaminated Soils, the United States shall bear 50 percent of any Future Remedy Costs incurred as a result of those Remedy Actions, and Plaintiffs shall bear 50 percent of such Future Remedy Costs.

    c.    For any Remedy Action related to NFS Contaminated Soils, Plaintiffs shall bear 100 percent of such Future Remedy Costs.

25.    If an area of contaminated soil is listed upon the attached Exhibit D, entitled "Soils," then the designation in Exhibit D shall be conclusive, for purposes of this Consent Decree, as to whether that area of contaminated soil shall be considered Project Contaminated Soils, Mixed Source Contaminated Soils, or NFS Contaminated Soils.

26.    For any area of contaminated soil that is not listed on the attached Exhibit D, entitled "Soils," the protocol described in this Paragraph shall be applied by the Parties to determine whether the area of contaminated soil should be classified as Project Contaminated Soils, Mixed Source Contaminated Soils, or NFS Contaminated Soils, as defined in this Consent Decree. This protocol relates only to the allocation of Remedy Costs between the Parties, and as such shall be considered a continuation of the mediation process described in this Court's Stipulation and Order of June 13, 2007, in which persons or entities other than the Parties are not entitled to participate.

    a.    Based on information available at the time the Remedy Action is selected, the Parties shall reach agreement on the boundary of the contaminated area, and shall

display the area on a map or drawing that shows its relation to other structures that are displayed on Drawing # 913-D-003, Rev. 2, a map that is maintained by both parties in files at the Site. For identification purposes, a compressed image of Drawing # 913-D-003, Rev. 2, is included in Exhibit D to this Consent Decree.

b.     After the boundary of the contaminated area is agreed upon by the Parties, the Parties shall meet within 60 days to attempt to agree upon the appropriate classification of the contaminated area as Mixed Source Contaminated Soils, NFS Contaminated Soils, or Project Contaminated Soils. After the first meeting, the parties may meet at whatever interval they determine is appropriate.

c.     Any contaminated soils that are not otherwise addressed in this Consent Decree shall be presumed to be Mixed Source Contaminated Soils. The party seeking to overcome this presumption shall have the burden of demonstrating that the contaminated soils in question meet the definition of NFS Contaminated Soils or Project Contaminated Soils that is contained in this Consent Decree. In the event that any dispute about the proper classification of contaminated soils is submitted to the Court pursuant to this Paragraph and Paragraph 55, the Court shall also use this presumption.

d.     Each Party may consult or refer to any resource, including documents and interviews, to determine which entity or entities conducted the operations that resulted in the contamination of the soil in question, with the exception that no Party shall rely on information, data, or documents that may not be disclosed to the other party because such information, data, or documents are privileged, confidential, confidential business information, or subject to non-disclosure because of classification under the National Security Classification System.

e.     At the first meeting between the Parties, each Party shall provide the other Party with a list that includes a brief description of all documents, data, and information, including witness statements or interview records, on which that Party relies for its position as to the correct classification of the contaminated soil in question. Each Party shall make such documents, data, and information available to the other Party upon request during normal business hours at the expense of the requesting Party. If a Party relies upon the statements of a person who is not its own employee, agent or consultant, that Party shall provide the business or home contact information of the person making the statements.

f.     If agreement is not reached at the first meeting concerning the correct classification of the contaminated soils at issue, then the Parties shall update the list of documents, data, and information upon which they rely every 30 days, and shall make such documents, data, and information available to the other Party,

until agreement is reached. After the date of the first meeting, the Parties may conduct additional factual analysis or retain experts or contractors to provide additional relevant data or information.

g.    If the Parties cannot reach agreement using the procedures set forth in this Paragraph within six months after their first meeting, then each Party shall state its position with respect to the factual data, analysis, and legal opinions relevant to the determination of the proper classification of the contaminated soils at issue. Those Statements of Position and the documents, data, and information upon which each party relies shall be included in a Record of Dispute and provided to to the President and CEO of NYSERDA and to the New York State Attorney General for Plaintiffs and the Assistant Secretary for Environmental Management for DOE, who shall attempt to reach agreement.

h.    If the President and CEO of NYSERDA and the Assistant Secretary for Environmental Management cannot reach agreement within 45 days, then the Parties may extend this time by mutual agreement in writing, or any Party may petition the Court for a determination of the appropriate classification of the contaminated soils at issue, pursuant to the provisions of Paragraph 55.

Underground Piping

27.    If Underground Piping is exhumed or treated incident to or as part of any Remedy Action covered by Paragraphs 13 through 26, and is disposed of as non-radioactive waste or as low-level radioactive waste with the surrounding soil, then such Underground Piping shall be considered part of the surrounding soil. In this event, the Paragraph of this Consent Decree that provides the allocation for any Future Remedy Costs incurred to address the surrounding soil shall also apply to any Future Remedy Costs incurred in the course of the exhumation or treatment of such Underground Piping.

28.    If Underground Piping is exhumed or treated incident to or as part of any Remedy Action covered by Paragraphs 13 through 26, and cannot be disposed of as non-radioactive waste or as low-level radioactive waste with the surrounding soil as described in Paragraph 27, then the allocation of Future Remedy Costs between Plaintiffs and the United States for the treatment or disposal of such Underground Piping shall be determined based on the location of the Underground Piping, as follows:

a.    For Underground Piping located on the North Plateau as of the Effective Date of this Consent Decree, the United States shall bear 90 percent of any Future Remedy Costs incurred as a result of the treatment or disposal of such Underground Piping that exceed the cost of treatment or disposal of the surrounding soil alone, and Plaintiffs shall bear 10 percent of such Future Remedy

Costs;

b.    For Underground Piping located on the South Plateau, outside the fenced
      boundary of the SDA, as of the Effective Date of this Consent Decree, the United
      States shall bear 50 percent of any Future Remedy Costs incurred as a result of
      the treatment or disposal of such Underground Piping that exceed the cost of
      treatment or disposal of the surrounding soil alone, and Plaintiffs shall bear 50
      percent of such Future Remedy Costs; and

c.    For Underground Piping located on the South Plateau, inside the fenced boundary
      of the SDA, as of the Effective Date of this Consent Decree, the United States
      shall bear 30 percent of any Future Remedy Costs incurred as a result of the
      treatment or disposal of such Underground Piping that exceed the cost of
      treatment or disposal of the surrounding soil alone, and Plaintiffs shall bear 70
      percent of such Future Remedy Costs.

29.    For any Remedy Action that is related to the exhumation, removal, or treatment of
       Underground Piping, and that is not covered by Paragraphs 13 through 26, Paragraph 28
       shall provide the allocation for any Future Remedy Costs incurred in the course of such a
       Remedy Action, including Future Remedy Costs incurred to excavate any
       uncontaminated surrounding soil.

30.    For any Remedy Action that includes both actions to remediate Underground Piping and
       actions to remediate soil or groundwater that is contaminated due to a leak from the
       Underground Piping:

a.    The provisions of Paragraph 28 shall apply to any Future Remedy Costs incurred
      to remediate the Underground Piping; and

b.    Any Future Remedy Costs incurred to remediate the soil or groundwater
      described in this Paragraph shall be allocated according to the Paragraph of this
      Consent Decree that would otherwise apply to that soil or groundwater,
      notwithstanding that the source of the contamination may be the Underground
      Piping.

Waste Tank Farm

31.    The United States shall bear 90 percent, and Plaintiffs shall bear 10 percent, of any
       Future Remedy Costs relating to the Waste Tank Farm that are incurred as a result of any
       Remedy Actions that the United States determines are necessary and are in accordance
       with such requirements as the Nuclear Regulatory Commission may prescribe.  Such
       Remedy Actions may include, but are not limited to the decontaminating,

decommissioning, monitoring and maintenance of the Waste Tank Farm, in accordance with such requirements as the Nuclear Regulatory Commission may prescribe.

32.  This Consent Decree does not affect any claims or defenses relating to Future Remedy Costs that may be incurred by any Party for any Remedy Actions pertaining to the Waste Tank Farm that DOE does not determine are necessary and in accordance with such requirements as the Nuclear Regulatory Commission may prescribe. Any such claims and defenses for Future Remedy Costs relating to the Waste Tank Farm are reserved by the Parties, as described in Paragraphs 38(e) and 41.

## ACCOUNTING PROCEDURES

33.  The provisions of Paragraphs 34 through 36 shall supersede the provisions of Section 5.03 of the Cooperative Agreement ("Accounting for Project Costs") for all Covered Matters, as defined in Paragraph 37. This Consent Decree does not affect, and shall not be construed to affect, any obligations or systems of payment between the Parties for any costs that are not for Covered Matters.

34.  Upon the written agreement of the Parties and for their mutual convenience, the Parties may develop and agree in writing upon an accounting procedure whereby each Party's share of Remedy Costs, as determined under this Consent Decree, shall be paid to (or credited against amounts owed by) the other Party. The following conditions shall apply to this Paragraph:

   a.  The Parties may agree in writing to adopt the provisions of Section 5.03 of the Cooperative Agreement ("Accounting for Project Costs"), with any necessary adaptations, for purposes of accounting for any Remedy Costs that may lawfully be paid by DOE, NYSERDA, or the State from available appropriations.

   b.  No party shall be required by anything in this Consent Decree to consent to any accounting procedure other than the procedure described in Paragraph 36, and any Party may choose to pay its share of Remedy Costs, as determined under this Consent Decree, pursuant to the provisions of Paragraph 36.

35.  The Parties hereby acknowledge that all or a portion of the Plaintiffs' share of Future Remedy Costs may be financed by the State, NYSERDA, or another agency or authority of the State through the issuance of bonds or notes, the interest on which is intended to be excluded from gross income for federal income tax purposes ("Tax Exempt Bonds"). The Parties agree that they will negotiate in good faith to establish accounting procedures that will, in Plaintiffs' view, maximize the eligibility of Plaintiffs' allocated share of such Future Remedy Costs for financing with Tax Exempt Bonds, provided that:

---

a.    The respective total liability of the United States and of Plaintiffs for Future Remedy Costs under Paragraphs 13 through 32 of this Consent Decree is not altered; and

b.    No action or agreement by the United States resulting from such negotiations shall be construed as an opinion concerning the eligibility of any Future Remedy Costs for financing with Tax Exempt Bonds.

36.    To the extent that the Parties do not agree on an alternative accounting procedure pursuant to Paragraph 34 for the payment of some or all Remedy Costs, the following procedures shall apply:

a.    Within 60 days of the end of any Federal fiscal year in which any Party incurs any Remedy Costs that, under the terms of this Consent Decree, shall be borne in part by another Party, the Party incurring the Remedy Costs shall deliver to the other Party an accounting of all Remedy Costs incurred by that Party during the preceding Federal fiscal year and a request for payment of the other Party's share of those costs, as determined under this Consent Decree (a "Payment Demand").

b.    Each Payment Demand shall include the following information:

i.    An invoice showing the amount of payment requested, fully divided into its detailed component Remedy Cost items, and showing which Paragraph of this Consent Decree determines the allocation between the Parties of each component Remedy Cost;

ii.    Reference to the contracts, purchase orders or other cost-authorizing documents under which the Remedy Costs were incurred, and documentation sufficient to show to whom such Remedy Costs were paid or will be paid;

iii.    Evidence that the party making the Payment Demand has actually incurred the Remedy Costs;

iv.    A certification signed by an official with personal knowledge of that Party's Remedy Actions that the information provided in the Payment Demand is true and accurate to the best of that Party's knowledge and that the Party believes in good faith that it is entitled to recover the amount requested; and

v.    Information about the manner in which payment is requested and the address or person to whom it should be directed.

c.  If any Payment Demand is made that does not conform to the requirements of this Paragraph, then the Party receiving the Payment Demand may choose either to accept it, or to reject it and return it to the Party that made it. If the Payment Demand is rejected, then the Party making the Payment Demand shall have a reasonable opportunity to provide additional information to complete the Payment Demand, and no time limits associated with payment for or disputes regarding the Payment Demand shall begin to run until a complete Payment Demand has been provided and received.

d.  After a complete Payment Demand has been made, the Party receiving the Payment Demand shall pay the amount requested within 180 days, unless that Party disputes the amount requested pursuant to the procedures set forth in Paragraphs 52 through 55 of this Consent Decree.

e.  No Payment Demand shall be made for an amount less than $100,000. If any Party incurs Remedy Costs in an amount less than $100,000 in any fiscal year that, under this Consent Decree, another Party is required to bear, then such Remedy Costs shall be carried over and made part of the next Payment Demand of $100,000 or more.

f.  Unless Plaintiffs provide written notice to the contrary, Payment Demands made by the United States to Plaintiffs shall be directed to:

Treasurer
New York State Energy Research and Development Authority
17 Columbia Circle
Albany, NY 12203

g.  Unless the United States provides written notice to the contrary, Payment Demands made by Plaintiffs to the United States shall be directed to:

Chief, Environmental Defense Section
United States Department of Justice
P.O. Box 23986
L'Enfant Plaza Station
Washington, DC 20026

Attn: DJ # 90-11-6-18024

## RELEASES AND DISMISSAL OF CLAIMS

37.  For purposes of this Consent Decree, "Covered Matters" means:

a.  All claims that Plaintiffs allege under CERCLA in Paragraphs 121 through 128 of the Complaint, under the heading of "CERCLA Response Costs," and any other claims for cost allocation or recovery of any Remedy Costs under CERCLA § 107(a)(4)(A), (B), or (D), or any other statute or common law theory, arising out of or in connection with the Site that Plaintiffs asserted or could have asserted against the United States in the Complaint based upon information that was known or reasonably could have been known to the Plaintiffs at the time the Complaint was filed, except for those claims relating to certain Remedy Costs that may be incurred with respect to the Waste Tank Farm as noted in Paragraph 32;

b.  All claims or counterclaims for cost allocation, contribution, or cost recovery for any Remedy Costs that any Party has raised, or could have raised based upon information that was known or reasonably could have been known to that Party at the time the Complaint was filed, arising out of or in connection with the Site under any statute or common law theory, to the extent the Remedy Actions giving rise to such Remedy Costs are covered by Paragraphs 13 through 32 of this Consent Decree, or are otherwise allocated between the Parties in this Consent Decree; and

c.  All claims for any Past Remedy Costs incurred by any Party for Remedy Actions at the Site; except that any claims DOE may have to seek recovery from Plaintiffs of 10 percent of any Past Remedy Costs that are Project Costs, shall not be considered "Covered Matters."

38.  For purposes of this Consent Decree, "Excluded Matters" means:

a.  All claims that DOE may have to seek recovery from Plaintiffs of 10 percent of any Project Costs that are not Future Remedy Costs, as defined by this Consent Decree;

b.  Plaintiffs' claims alleged in Paragraphs 129 and 130 of the Complaint under CERCLA § 107(a)(4)(C), under the heading of "CERCLA Natural Resource Damages," and any defenses or counterclaims that the United States may have in connection with those claims;

c.  Plaintiffs' claim alleged in Paragraphs 136 through 139 of the Complaint under the NWPA, and any defenses or counterclaims that the United States may have in connection with that claim;

d.  Any claim that a Remedy Action planned or performed by any Party has not been selected or performed in accordance with applicable law;

e.    Any claim that any law requires any Party to undertake Remedy Actions in addition to those that have been selected or performed by that Party, and any defenses or counterclaims to such a claim. Claims that are considered Excluded Matters under this subparagraph shall include, but are not limited to: (i) Plaintiffs' claims in Paragraphs 134 and 135 of the Complaint that WVDPA § 2(a)(5) requires the United States to maintain, repair or replace, and monitor any facility, hardware or tank that is decommissioned in place at the Site and to take appropriate measures in the event of a release of a contaminant from such unit irrespective of when the release occurs; and (ii) any claims, defenses or counterclaims alleging that Remedy Actions are required to be taken by any Party other than or in addition to those that DOE determines are necessary and consistent with such requirements as the Nuclear Regulatory Commission may prescribe; and

f.    Any claim or counterclaim for cost recovery that either Party may have now or in the future against the other Party based upon information that was not known and could not reasonably have been known to that Party at the time the Complaint was filed.

39.    Plaintiffs hereby covenant and agree not to sue the United States upon, and to release, surrender, and discharge, all claims and causes of action against the United States arising out of or in connection with Covered Matters.

40.    The United States hereby covenants and agrees not to sue Plaintiffs upon, and to release, surrender, and discharge, all claims, counterclaims, and causes of action against Plaintiffs arising out of or in connection with Covered Matters.

41.    All Excluded Matters asserted in the Complaint, except the NWPA claim described in Paragraph 38(c), shall be and hereby are dismissed without prejudice. The Parties expressly reserve all claims, counterclaims, potential defenses (expressly including both substantive and jurisdictional defenses), or causes of action against any other Party arising out of or in connection with Excluded Matters. The NWPA claim set forth in Plaintiffs' complaint and described in Paragraph 38(c) is neither settled nor dismissed pursuant to this Consent Decree.

42.    In the event that any future litigation addresses a claim that any Party is required to perform Remedy Actions other than or in addition to those that have been or will be selected or performed by either Party (or to contribute to the Remedy Costs of such actions), nothing in this Consent Decree shall be construed to affect the resolution of that litigation; except that if any such claim results in a judgment requiring any Party to conduct additional Remedy Actions at the Site (or to contribute to the Remedy Costs of such actions), and if such Remedy Actions address those areas of contamination at the

Site that are covered by Paragraphs 13 through 32 of this Consent Decree, then the allocation between the Parties of the Future Remedy Costs associated with such Remedy Actions shall be considered a "Covered Matter" according to this Consent Decree, and the Parties intend that this Consent Decree shall have preclusive effect with respect to the allocation of such costs.

## EFFECT ON NON-PARTIES

43.    Nothing in this Consent Decree shall be construed as a dismissal or release of any claims that any Party has against any person, entity or organization that is not a Party.

44.    The Parties expressly reserve any rights they may have under any law, including but not limited to CERCLA § 107(a) and CERCLA § 113(f)(1), to recover costs or damages arising out of or in connection with Covered Matters against any person, entity or organization that is not a Party.

45.    Within 10 days after any Party files a complaint to recover costs or damages arising out of or in connection with Covered Matters against any person, entity or organization that is not a Party, that Party shall provide notice to all other Parties that it has filed such a complaint.

46.    In the event that Plaintiffs seek to recover any costs or damages from any person, entity or organization that is not a Party arising out of Covered Matters, the Parties agree and acknowledge, and the Court finds, that the United States is entitled to contribution protection pursuant to CERCLA § 113(f) and any other applicable federal or state law, including but not limited to Section 15-108 of the New York General Obligations Law, that extinguishes the United States' liability for contribution to any person, entity or organization that is not a Party.

47.    In the event that the United States seeks to recover any costs or damages from any person, entity or organization that is not a Party arising out of Covered Matters, the Parties agree and acknowledge, and the Court finds, that Plaintiffs are entitled to contribution protection pursuant to CERCLA § 113(f), and any other applicable federal or state law, including but not limited to Section 15-108 of the New York General Obligations Law, that extinguishes Plaintiffs' liability for contribution to any person, entity or organization that is not a Party.

## CONSULTATION IN IMPLEMENTATION OF REMEDY ACTIONS

48.    For any Remedy Action selected pursuant to Paragraphs 13 through 32 of this Consent Decree:

a.  If the document in which the Remedy Action is selected identifies the Party that will carry out the Remedy Action, that Party shall be considered the Responsible Party for purposes of the consultation provisions of this Consent Decree;

b.  If the Remedy Action, when selected, does not identify the Party that will carry out the Remedy Action, and this Consent Decree provides that the United States shall bear 50 percent or more of the Remedy Costs for that Remedy Action, then the United States shall be considered the Responsible Party;

c.  If the Remedy Action, when selected, does not identify the Party that will carry out the Remedy Action, and this Consent Decree provides that the United States shall bear less than 50 percent of the Remedy Costs for that Remedy Action, then one of the Plaintiffs (as Plaintiffs shall designate) shall be considered the Responsible Party.

49.  Within one year after the entry of this Consent Decree, or at such later time as the Parties may agree, the Parties shall develop and mutually agree upon detailed plans to assure continued consultation between the Parties prior to and during the performance of Remedy Actions.  These plans shall include, but need not be limited to, provision for the following:

a.  Each Party may designate a representative (the "Consulting Party's Representative") to conduct consultations with respect to any Remedy Actions;

b.  The Responsible Party shall distribute to the Consulting Party's Representative all draft and final technical reports, contractors' reports, Site budget documents and cost estimates, documents relating to contractor selection, and other documents pertaining to a Remedy Action, to the extent such distribution is permitted by applicable law, and shall permit the Consulting Party's Representative to attend meetings pertaining to the planning or performance of a Remedy Action, upon a reasonable request from the Consulting Party;

c.  The Responsible Party shall inform the Consulting Party's Representative of plans and specifications for the construction and completion of a Remedy Action, or for any major changes to a Remedy Action that may be necessary;

d.  The Responsible Party shall permit the Consulting Party's Representative access to the area where the Responsible Party is conducting a Remedy Action, for the purposes of inspecting the same and observing the progress of the Remedy Action;

e.  The Responsible Party shall meet with the Consulting Party's Representative, at

the latter's reasonable request, to discuss the manner in which the Remedy Action is to be performed, and shall consider in good faith any points or objections raised by the Consulting Party's Representative. This discussion may relate to any aspect of the Remedy Action that the Responsible Party has the ability to alter or amend at its discretion, but the Parties intend that the consultation shall promote the interests of efficiency, effectiveness, environmental benefits, and cost savings in the performance of Remedy Actions;

f.     Each Responsible Party shall meet with the Consulting Party's Representative not less often than every six months to share information concerning any Remedy Actions that the Responsible Party plans to initiate during the following six months; and

g.     Documents and information that constitute confidential business information shall be shared with the Consulting Party's Representative under this Paragraph only when the Responsible Party shall consider it necessary for adequate consulation. To the extent the consultation procedures agreed upon by the Parties pursuant to this Consent Decree include the sharing of any documents or information constituting confidential business information, no Party may further release such information unless required by law or ordered by a court of competent jurisdiction.

50.     The Responsible Party for each Remedy Action shall have the final authority to make all decisions (consistent with any applicable laws) with respect to the planning, management, implementation and completion of that Remedy Action. The consultation procedures adopted pursuant to Paragraph 49 shall not create any enforceable right or obligation under this Consent Decree, including any obligation with respect to the Responsible Party's planning, management, implementation and completion of any Remedy Action, other than those explicitly stated. The consultation procedures adopted pursuant to Paragraph 49 shall be carried out in a timely manner that is consistent with the expeditious completion of Remedy Actions.

51.     The consultation procedures adopted pursuant to Paragraph 49 shall apply only after the selection of a Remedy Action. These consultation procedures shall not be used to determine or to amend the scope, nature, or purpose of a Remedy Action, the identity of the Responsible Party, the stringency of any environmental remediation, or any other issue that is not within the discretion of the Responsible Party to alter or amend.

## DISPUTE RESOLUTION

52.     Any dispute which arises under this Consent Decree shall in the first instance be subject to informal negotiations between the Parties. If such informal negotiations are not

completed within 60 days, then either party may invoke the Dispute Resolution provisions of this Consent Decree.

53.    The Dispute Resolution provisions of this Consent Decree shall apply to, but are not limited to, disputes concerning the proper Cost Allocation category described in Paragraphs 13 through 31 that may apply to a Remedy Action; disputes concerning whether a Party has made an accounting error in making or responding to a Payment Demand; disputes concerning whether claimed costs are Remedy Costs that were incurred in the course of performing a Remedy Action, as those terms are defined in this Consent Decree; and disputes concerning the interpretation of this Consent Decree; *except that* disputes concerning the classification of areas of soil contamination under this Consent Decree shall be addressed under Paragraph 26.  The Dispute Resolution provisions of this Consent Decree shall not apply to disputes over whether any Party is required to select or to carry out any particular Remedy Actions.

54.    In the event that the Parties cannot resolve a dispute by informal negotiations under Paragraph 52, then the Parties may conduct any method of dispute resolution to which they may mutually agree, including but not limited to mediation.  If the Parties are unable to agree on a method of dispute resolution, then the following procedures shall apply:

    a.    The Party claiming that a dispute exists shall provide to the other Party a Statement of Position, including but not limited to any factual data, analysis, or legal opinion supporting that position and any documentation upon which the Party relies.

    b.    If the dispute concerns the payment of a Payment Demand, then the party refusing to pay the Payment Demand shall provide the first Statement of Position within 30 days of receiving the Payment Demand.

    c.    Within 30 days after receiving a Statement of Position from a Party, the other Party shall provide its own Statement of Position and any documentation upon which it relies.

    d.    Each Party shall make the factual data and documentation upon which it relies, and other factual data and documentation relevant to the dispute, available to the other Party upon request during normal business hours at the expense of the requesting Party.

        i.    A representative of each Party producing factual data and documentation having personal knowledge of the document search shall provide written certification that the Party has made a good faith effort to identify and make available all factual data and documentation within the Party's

State of New York v. United States, No. 06-cv-810 (W.D.N.Y.)
Consent Decree                                                                                           Page 21

possession, custody or control that is relevant to the dispute.

ii.    Where this provision applies to DOE, factual data and documentation that is in existence as of the Effective Date of this Consent Decree shall not be considered within DOE's "possession, custody or control" unless it is stored as of the Effective Date of this Consent Decree at any of the following locations:

U.S. Department of Energy
Office of History and Heritage Resources, MA-75
1000 Independence Ave., S.W.
Washington, DC 20585-1290

Iron Mountain
1137 Branchton Road, Box 6
Boyers, PA 16020

U.S. Department of Energy
EM Consolidated Business Center
250 East 5th Street, Suite 500
Cincinnati, OH 45202

U.S. Department of Energy
West Valley Demonstration Project
(Also referred to as the DOE West Valley facility)
10282 Rock Springs Road
West Valley, NY 14171-9799

U.S. Department of Energy
Washington National Records Center
4205 Suitland Road
Suitland, MD 20746-8001

U.S Department of Energy
West Valley Demonstration Project
Ashford Office Complex
9030 Route 219
West Valley, NY 14171

Factual data and documentation that is created after the Effective Date of this Consent Decree may be considered within a Party's "possession, custody, or control" irrespective of where they are stored.

e.    The Party claiming a dispute shall maintain a Record of Dispute, including all Statements of Position and supporting documents concerning the dispute that either Party wishes to include.

f.    After all Statements of Position have been provided, the Parties shall enter into a period of negotiation not to exceed 60 days. Negotiations at this stage may include counsel and other employees or consultants of each Party that are familiar with the facts relevant to the dispute.

g.    If the Parties are unable to resolve the dispute during the period of negotiation, then the Record of Dispute shall be provided to the President of NYSERDA and to the New York State Attorney General for Plaintiffs and to the Assistant Secretary for Environmental Management for DOE, who shall attempt to reach agreement. If the President of NYSERDA for Plaintiffs and the Assistant Secretary for Environmental Management are unable to reach agreement within 45 days, then the Parties may extend this time by mutual agreement in writing, or either Party may petition the Court for appropriate relief.

55.    In the event that any dispute is submitted to the Court pursuant to Paragraphs 26 or 54 of this Consent Decree:

a.    The Court shall consider the Record of Dispute and the provisions of this Consent Decree.

b.    The Court shall not consider arguments that have not been raised by either Party during the period of negotiations between the Parties.

c.    The Court shall not consider any data or documentation that was not included in the Record of Dispute unless such data or documentation came into being after the creation of the Record of Dispute, or either Party shows, on clear and convincing evidence, that the Record of Dispute is incomplete. In the event that the Record of Dispute is supplemented with new data or documentation, upon the petition of one or both Parties, the Court shall return the dispute to a stage in the informal negotiations at which such data or documentation may be taken into account by all Parties.

d.    The Court shall not give deference to the position of either Party.

## APPROPRIATIONS

56.    The obligations imposed upon the United States by this Consent Decree may only be undertaken using funds that are appropriated for such purpose or otherwise lawfully

available. No provision of this Consent Decree shall be interpreted as or constitute a commitment by the United States to obligate or pay any funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable federal statute. In cases where payment or obligation of funds would constitute a violation of the Anti-Deficiency Act, the dates requiring the payment or obligation of such funds shall be appropriately adjusted.

57. The obligations imposed upon the Plaintiffs by this Consent Decree shall not constitute a debt of the State within the meaning of any provisions of the New York State constitution or any New York State statute, and such obligations may only be undertaken by the Plaintiffs using funds that have been appropriated for such purpose or are otherwise lawfully available as set forth in Section 41 of the State Finance Law. In cases where appropriations or funds otherwise lawfully available are insufficient to meet Plaintiffs' obligations, the dates requiring the payment or obligation of such funds shall be appropriately adjusted.

## ENTRY OF CONSENT DECREE

58. The Parties shall lodge this Consent Decree with the Court after it is signed by all Parties.

59. This Consent Decree shall not become effective until its entry by the Court.

60. The United States District Court for the Western District of New York shall retain jurisdiction over the subject matter of this Consent Decree and over the Parties for the duration of the performance of Remedy Actions that are covered by this Consent Decree. Subject to the provisions of Paragraphs 52 through 55, the Parties may apply to the Court for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance its terms.

## NEGOTIATION AND EFFECT OF CONSENT DECREE

61. This Consent Decree was negotiated and executed by the Parties in good faith and at arms' length, and is a fair and equitable compromise of claims. Nothing in this Consent Decree shall be construed as an admission of any issue of law or fact by any Party, nor as a waiver of any claim or defense, on any grounds, except as specifically stated herein. The Parties further specifically agree that nothing in this Consent Decree shall be construed as an admission that any particular statute determines the liability of any Party to conduct or pay for any particular Remedy Action.

62. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States and the Plaintiffs with

respect to all Covered Matters.

## COMPLETE AGREEMENT

63.    This Consent Decree embodies the complete agreement between the Parties regarding the claims and other matters addressed herein and fully supersedes all prior contracts, agreements, understandings, negotiations or discussions, oral or written, relating to the allocation of costs between the Parties for any Remedy Actions covered by this Consent Decree, specifically including (but not limited to) any provisions of the Cooperative Agreement that may relate to Covered Matters.  There are no warranties, representations, agreements, or understandings relating to Covered Matters that are not fully expressed or provided for herein.

## MODIFICATION

64.    Any provision of this Consent Decree may be modified by written stipulation of the Parties and the approval of the Court.

## TERMINATION

65.    The Parties may jointly move the Court for termination of this Consent Decree under such circumstances upon which they may mutually agree, or upon the grounds that all necessary Remedy Actions that would be encompassed within this Consent Decree are complete.  The Parties may also move for partial termination of this Consent Decree with respect to any of the Cost Allocation categories described in Paragraphs 13 through 32, upon the grounds that all necessary Remedy Actions that would be encompassed within that category are complete.  The Parties intend, and the Court finds, that the termination of this Consent Decree in whole or in part shall have no effect on Paragraph 10, Paragraphs 37 through 42, or Paragraphs 43 through 47, and such provisions shall survive termination of this Consent Decree unless the Parties agree otherwise.

## GOVERNING LAW

66.    This Consent Decree shall be governed and interpreted in accordance with United States federal law.

## SUCCESSOR AND ASSIGNS

67.    This Consent Decree shall be binding on the United States, and shall be binding on Plaintiffs and any successors and assigns of the Plaintiffs (including any person, entity or organization that acquires title to or other interest in real property at the Site, or that assumes Plaintiffs' liability for any Remedy Costs incurred at the Site).

## HEADINGS

68.    The paragraph headings in this Consent Decree are provided for the convenience of the reader and shall not be construed to alter the meaning of any paragraph or provision of this Consent Decree.

## ORIGINAL COUNTERPARTS

69.    This Consent Decree may be executed in any number of original counterparts, each of which shall be deemed to constitute one agreement.  The execution of one counterpart by any Party shall be deemed to have the same force and effect as if that Party had signed all other counterparts.

## AUTHORITY

70.    Each signatory to this Consent Decree hereby certifies that he or she has been duly authorized to enter into this Consent Decree by the Party on whose behalf he or she signs.

## NOTICE

71.    All notices or written communications pertaining to this Consent Decree, other than requests for payment pursuant to this Consent Decree, shall be sent by the Parties to the following addresses:

For the plaintiffs:

> General Counsel
> New York State Energy Research and Development Authority
> 17 Columbia Circle
> Albany, NY 12203
>
> Office of the Attorney General, State of New York
> Environmental Protection Bureau
> Main Place Tower
> 350 Main Street
> Buffalo, NY 14202
>
> New York State Department of Environmental Conservation
> 625 Broadway
> Albany, NY 12233

For the United States:

Chief, Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026
Attn: DJ # 90-11-6-18024

Chief, Natural Resources Section
U.S. Department of Justice
P.O. Box 663
Washington, DC 20044
Attn: DJ # 90-1-0-12145

General Counsel
U.S. Department of Energy
1000 Independence Avenue SW
Washington, DC 20585

SO ORDERED on this 17th day of August 2010.

Hon. John T. Curtin
United States District Judge
for the Western District of New York

AS AGREED: *see also Item #36*

*FOR PLAINTIFFS STATE OF NEW YORK*
*AND NEW YORK DEPARTMENT OF*
*ENVIRONMENTAL CONSERVATION*

ANDREW M. CUOMO
Attorney General of the State of New York

By:

LINDA E. WHITE
(716) 853-8466

State of New York v. United States, No. 06-cv-810 (W.D.N.Y.)
Consent Decree

Assistant Attorney General
Environmental Protection Bureau
Main Place Tower, Suite 300A
350 Main Street
Buffalo, N.Y. 14202

*FOR PLAINTIFF NEW YORK STATE ENERGY*
*RESEARCH AND DEVELOPMENT AUTHORITY:*

By:

SHEILA D. JONES
HOLLAND & HART LLP
(202) 393-6500
975 F Street NW
Suite 900
Washington, D.C. 20004
Attorneys for NYSERDA

*FOR DEFENDANTS:*

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division

By:

DAVID GUNTER
STACEY BOSSHARDT
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986

KATHLEEN M. MEHLTRETTER
Acting United States Attorney

MARY K. ROACH
Assistant United States Attorney
Western District of New York

Assistant Attorney General
Environmental Protection Bureau
Main Place Tower, Suite 300A
350 Main Street
Buffalo, N.Y. 14202

*FOR PLAINTIFF NEW YORK STATE ENERGY
RESEARCH AND DEVELOPMENT AUTHORITY:*

By:

_____
SHEILA D. JONES
HOLLAND & HART LLP
(202) 393-6500
975 F Street NW
Suite 900
Washington, D.C. 20004
Attorneys for NYSERDA

*FOR DEFENDANTS:*

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division

By:

_____
DAVID GUNTER
STACEY BOSSHARDT
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986

KATHLEEN M. MEHLTRETTER
Acting United States Attorney

MARY K. ROACH
Assistant United States Attorney
Western District of New York

---

138 Delaware Avenue
Buffalo, New York 14202

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| - v - | ) |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |

No. 06-CV-810

**EXHIBITS TO CONSENT DECREE**

Exhibit A    Interim End State Activities

Exhibit B    Lagoons

Exhibit C    Main Process Plant

Exhibit D    Soils

Exhibit E    Map of North and South Plateaus

Exhibit F    NRC-Licensed Disposal Area ("NDA")

Exhibit G    Project Structures

Exhibit H    Source Area

[No exhibit is designated Exhibit I]

Exhibit J    State-Licensed Disposal Area ("SDA")

Exhibit K    Waste Tank Farm

**EXHIBIT A**

**INTERIM END STATE ACTIVITIES**

The following actions shall be considered "Interim End State Activities" for purposes of this Consent Decree:

Decontamination of Main Plant Process Building (MPPB) and preparation for demolition

Deactivation and decontamination of the MPPB to reduce radiological risk, and preparation of the facility for decommissioning by demolition and off-site disposal of wastes. With the exception of systems required to remain operational for the High Level Waste Interim Storage Facility (HLWISF), this activity includes removal of major equipment, debris, piping, conduits, etc. This activity includes the stabilization or removal of surface contamination on walls, floors, and ceilings to the extent necessary to meet the requirements of an approved demolition plan.

Preparation of Remote-Handled Waste Facility (RHWF) and Vitrification Facility for demolition

Deactivation and decontamination of the RHWF and Vitrification facility to reduce radiological risk, and preparation of the facilities for decommissioning by demolition and off-site disposal of wastes. This activity includes removal of major equipment, debris, piping, conduits, etc. This activity includes the stabilization or removal of surface contamination on walls, floors, and ceilings to the extent necessary to meet the requirements of an approved demolition plan.

Shipment of legacy waste

Characterization, processing, packaging, and disposal off-site (in accordance with applicable laws, regulations, and DOE directives) of: (a) Legacy Waste that is stored on the Site as of the date of this Consent Decree; and (b) waste generated as a result of Site operations and deactivation and decontamination activities. "Legacy Waste" refers to all low-level radioactive waste (including miscellaneous solids, liquids, sludges, resins, and oily wastes); remote-handled wastes (including wastes that have been remotely handled and wastes that will be remotely handled); Greater-Than-Class C (GTCC) waste; transuranic (TRU) and suspect TRU wastes; mixed TRU waste; mixed low-level waste; waste that is defined as "hazardous waste" in Subtitle C of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq.; industrial waste that is not defined as "hazardous waste" in Subtitle C of RCRA; and sanitary waste.

Removal of Ancillary Facilities

Decontamination, deactivation, demolition, dismantling, removal, and disposal off-site of Ancillary Facilities. "Ancillary Facilities" are those Site facilities that are no longer needed for maintaining the WVDP in a safe, stable configuration; those not required for High-Level Waste

(HLW) canister storage; and those not required for storage of orphan waste (e.g., TRU and mixed TRU).

Drying and Maintenance of Waste Tank Farms

Drying of the high-level waste tanks and vaults, and maintenance in a dry condition, to eliminate future corrosion of the tanks. Removal and treatment of residual liquids from the high-level waste tanks and vaults. Design, construction, and operation of a drying system for the tanks.

Covering of NRC-Licensed Disposal Area ("NDA")

Construction of a groundwater barrier and geomembrane cover, including surface water controls, as an interim measure to minimize surface water and groundwater infiltration into the NDA.

Mitigation of North Plateau Groundwater Plume

Implementation of mitigation for the North Plateau Groundwater Plume, including measures such as a permeable treatment wall, to reduce or eliminate Strontium-90 presence in groundwater seepage leaving the Project Premises and to minimize the expansion of the North Plateau Groundwater Plume.

Evaluation of High-Level Waste Canisters

Evaluation of the relocation of high-level waste canisters to new storage at the Site, including the conceptual design of a storage facility, systematic identification of an appropriate location for a new storage facility, and design of the canister load-out system (i.e., design of facility modifications for the Equipment Decontamination Room and the Canister Load-Out Facility).

## EXHIBIT B

## LAGOONS

The following structures shall be considered "Lagoons" for purposes of this Consent Decree:

Lagoon 1

Lagoon 1 consisted of the clay cap, the hardstand waste within the original Lagoon 1 footprint, and potentially contaminated sand and gravel around and underlying Lagoon 1. The extent of Lagoon 1 encompasses an area not to exceed 30.4-meter by 30.4-meter (100-foot by 100-foot) and extends no more than 0.6 meters (2 feet) into the Lavery till, with a total depth of approximately 4.3 meters (14 feet). If Lagoon 1 is exhumed as part of USDOE's decision-making, additional surrounding soils may also be removed. These additional soils, which for purposes of this Consent Decree shall be considered part of Lagoon 1, include soils between Lagoon 1 and the interceptors southwest of Lagoon 1, soils between Lagoon 1 and the boundary of Lagoon 2, and the soils in and around the interceptors southwest of Lagoon 1, but will not exceed an area totaling 5,800 square meters (64,000 square feet) in size with a total depth not to exceed 4.3 meters (14 feet). The footprint of Lagoon 1 is as described in Drawing Number 40A-S-30. Full-size copies of Drawing Number 40A-S-30 are maintained by both parties in files at the Site. A compressed image of this document, for identification purposes, appears below:



Lagoon 2

Lagoon 2 consists of the footprint of the Lagoon as described in Drawing Number 40B-S-1021, and a depth not to exceed 0.6 meters (2 feet) along all sides of the Lagoon and 0.6 meters (2 feet) into the Lavery till underlying the bottom of the Lagoon.

Lagoon 3

Lagoon 3 consists of the footprint of the Lagoon as described in Drawing Number 40B-S-1021, and a depth not to exceed 0.6 meters (2 feet) along all sides of the Lagoon and 0.6 meters (2 feet) into the Lavery till underlying the bottom of the Lagoon.  If Lagoon 3 is exhumed as part of the USDOE's decision-making, the stainless-steel liner would also be removed from the discharge weir.

Full-size copies of Drawing Number 40B-S-1021 are maintained by both parties in files at the Site.  A compressed image of this document, for identification purposes, appears below:



Lagoon 4

Lagoon 4 consists of a membrane liner, the footprint of the Lagoon and a depth not to exceed 0.5 meters (1.5 feet) of potential radioactively contaminated soil beneath the liners on the sides and bottom of the Lagoon. The footprint of Lagoon 4 is as described in Drawing Number 2401-02-802-17.  Excavation of the bottom of Lagoons 4 and 5 will be complete when the liner, concrete grout and clay layers have been removed.

Lagoon 5

Lagoon 5 consists of a membrane liner, the footprint of the Lagoon and a depth not to exceed 0.5 meters (1.5 feet) of potential radioactively contaminated soil beneath the liners on the sides and bottom of the Lagoon.  The footprint of Lagoon 5 is as described in Drawing Number 2401-02-802-17.

Full-size copies of Drawing Number 2401-02-802-17 are maintained by both parties in files at the Site.  A compressed image of this document, for identification purposes, appears below:



**EXHIBIT C**

**MAIN PROCESS PLANT**

The following structures, described by names in use among DOE and NYSERDA personnel at the Site as of the date of this Consent Decree, shall be considered part of the "Main Process Plant" for purposes of this Consent Decree:

1.  Contact Size Reduction Facility
2.  Cooling Tower
3.  Fire Pumphouse
4.  Head End Ventilation (HEV) & Decon Shop Waste Catch Tank 15D-6
5.  Laundry Room and Laundry Shed
6.  Main Plant Office Building
7.  Main Plant Process Building
8.  Main Water Storage Tank
9.  Master Slave Manipulator Repair Shop
10. Tank 35104
11. Utility Room
12. Utility Room Expansion, including Water Chemistry Control Equipment and the Fuel Oil Tanks (31D-02)
13. Low Level Waste (LLW) Catch Tank from Lab Drains (7D-13)
14. Fuel Receiving and Storage Building (FRS), including Fuel Pool
15. FRS Pump Shed
16. FRS Ventilation Building
17. 01-14 Building, including the 01-14 ammonia tank
18. Cold Chemical Facility
19. Load-In/Load-Out Facility
20. Off-Gas Trench
21. Vitrification Facility Building
22. Radwaste Process Building (Hittman)
23. Electrical Transformers (East of the Utility Room)

**EXHIBIT D**

**SOILS**

For purposes of this Exhibit, the areas of soil identified below are described where possible using facility numbers on the 2006 Site Map (also known as DWG # 913-D-003 Rev. 2). Full-size copies of this map are maintained by both parties in files at the Site. A compressed image of this map, for identification purposes, appears at the end of this Exhibit.

**Schedule D(1): Mixed Source Contaminated Soils**

The following areas of contaminated soil shall be considered Mixed Source Contaminated Soils for purposes of this Consent Decree:

1.    Construction and Demolition Debris Landfill (Facility # 77)
2.    Demineralizer Sludge Ponds (Facility # 79)
3.    Solvent Dike (Facility # 111)
4.    Maintenance Shop Leach Field (Facility # 93)
5.    Old/New Hardstand Storage Area (Facility # 103)
6.    Low Level Waste Treatment Building (O2 Building) (Facility # 2)
7.    Stream Sediments Within the Site Premises (as those areas are defined by further characterization)

**Schedule D(2): NFS Contaminated Soils**

The following area of contaminated soil shall be considered NFS Contaminated Soils for purposes of this Consent Decree:

1.    Cesium Prong (as that area is defined by further characterization)

**Schedule D(3): Project Contaminated Soils**

The following areas of contaminated soil shall be considered Project Contaminated Soils for purposes of this Consent Decree:

1.    Effluent Mixing Basin (Equalization Basin) (Facility # 71)
2.    Firing Range Area (Facility # 35)

*[image on following page]*



State of New York v. United States, No. 06-cv-810 (W.D.N.Y.)
Consent Decree

Exhibits Page 9

## EXHIBIT E

## MAP OF NORTH AND SOUTH PLATEAUS

For purposes of this Consent Decree, the North Plateau is the area within the "WVDP Boundary Line" on the following map that is north of Erdmann Brook, and that is generally south of Quarry Creek and west of Frank's Creek. The South Plateau is the area within the "WVDP Boundary Line" on the following map that is south of Erdmann Brook, and that is generally west and north of Frank's Creek.



**EXHIBIT F**

**MAP OF NRC-LICENSED DISPOSAL AREA ("NDA")**

The following structures and areas, described by names in use among DOE and NYSERDA personnel at the Site as of the date of this Consent Decree, shall be considered part of the "NDA" for purposes of this Consent Decree:

1.   Liquid Pretreatment System
2.   NDA Caissons
3.   NDA Deep Holes
4.   NDA Hardstand/Staging Areas
5.   NDA Lagoon
6.   NDA Maintenance Shed
7.   NDA Office Trailer
8.   NDA Special Holes
9.   NDA Speed Space
10.  NDA Trenches
11.  Transfer Line for SDA Liquids and NDA Interceptor Trench Liquids
12.  NDA Interceptor Trench
13.  Infiltration Controls
14.  Soils within the NDA boundary

The following map shows the location and boundaries of the "NDA" for purposes of this Consent Decree:

[*image on following page*]



**EXHIBIT G**

**PROJECT STRUCTURES**

      The following structures, described by names in use among DOE and NYSERDA personnel at the Site as of the date of this Consent Decree, shall be considered "Project Structures" for purposes of this Consent Decree:

1.    Radwaste Treatment System (RTS) Drum Cell, including Control Tower, Instrumentation Monitoring Shed and support structures
2.    ELAB - Expanded Environmental Lab, including Vitrification cold lab, storage sheds, garage, access areas
3.    Meteorological Tower (New)
4.    Monitoring Wells/Stations
5.    Storage Locations for Well Purge Water
6.    Firing Range Buildings and Trailers
7.    Waste Tank Farm Test Towers
8.    Administration Building
9.    Communications Hub Shed
10.   Dosimetry Lab
11.   Electrical Transformers
12.   Emergency Vehicle Shelter
13.   New Communications Shed
14.   Radiation Protection Counting Lab
15.   Rail Spur
16.   Road-Salt and Sand Storage Shed
17.   Security Gatehouse and Fences
18.   Sheriff's Station
19.   Vehicle Maintenance Shop
20.   Low-Level Waste Treatment Facility (LLW2)
21.   Asbestos Decon Shower
22.   Industrial Waste Storage Area, Lube Storage Lockers and 2 Metal Lockers
23.   Above-ground Petroleum Tanks (41-D-021 and 41-D-022)
24.   Remote Handled Waste Facility, including tanks, cargo containers, support structures
25.   Equalization Tank
26.   Old Sewage Treatment Facility
27.   Waste-Water Treatment Facility
28.   Above-ground Trailers and storage sheds
29.   Vitrification Diesel Fuel Oil Storage Tank & Building (FOD-11) cement pad
30.   Vitrification Test Facility, including storage, support and training areas
31.   Vitrification Test Facility Waste Storage Area, including 61-D-07 and 65-D-01
32.   Product Storage Area

33.    Warehouse (Main2)
34.    Warehouse Bulk Oil Storage Unit
35.    Warehouse Extension Waste Management Staging Area
36.    Chemical Process Cell-Waste Storage Area
37.    Hazardous Waste Storage Lockers 1-4
38.    HLW Tank Pump Storage Vaults (8D-2 Extraction Pumps)
39.    LAG Storage Building
40.    LAG Storage Area 1
41.    LAG Storage Area 3
42.    LAG Storage Area 4, including Shipping Depot, Waste Packaging Area and Container Sorting and Packaging Facility (CSPF)
43.    Vitrification Waste Storage Vaults (1-4)
44.    Clarifier
45.    Demineralized Water Tank
46.    Low-Level Waste Treatment Building (O2 Building )
47.    Old (Main) Warehouse
48.    Construction (Vitrification) Fab Shop
49.    Maintenance Shop and associated septic tanks
50.    Sample Sorting and Packaging Facility
51.    Test and Storage Building ("TSB")
52.    Waste Paper Incinerator Pad
53.    Rail Packaging and Staging Areas
54.    North Parking Lot
55.    South Parking Lot
56.    Operation, use and maintenance of Dam and reservoirs, including pump house, pumps and associated equipment until surrender to the State of New York

**EXHIBIT H**

**SOURCE AREA**

For purposes of this Consent Decree, the "Source Area" shall be considered the contaminated subsurface soils within the area shown on the following map that is bounded by the "Proposed Temporary Upgradient Sheet Pile Wall" to the north, south and west, and by the "Proposed Permanent Downgradient Soil-Cement- Bentonite Barrier Wall" to the north and east.

*[image on following page]*



**EXHIBIT J**

**MAP OF STATE-LICENSED DISPOSAL AREA ("SDA")**

The following structures and areas, described by names in use among DOE and NYSERDA personnel at the Site as of the date of this Consent Decree, shall be considered part of the "SDA" for purposes of this Consent Decree:

1.    SDA FRAC Tanks and  Building
2.    SDA Leachate Storage Tank (T-1), Leachate, and Building
3.    State-Licensed Disposal Area Disposal Trenches
4.    North Lagoon
5.    South Lagoon
6.    Inactive Lagoon
7.    Infiltration Controls
8.    Soils within the SDA boundary

The following map shows the location and boundaries of the "SDA" for purposes of this Consent Decree:

[*image on following page*]



**EXHIBIT K**

**WASTE TANK FARM**

The following structures, described by names in use among DOE and NYSERDA personnel at the Site as of the date of this Consent Decree, shall be considered part of the "Waste Tank Farm" for purposes of this Consent Decree:

1. Con-Ed Building
2. High-Level Waste Transfer Trench
3. High-Level Waste Tank Pumps
4. Nitrogen Storage Tank (8C-2)
5. Permanent Vent System and associated building
6. PVS Stack Monitoring Shed
7. Supernatant Treatment System (STS), including STS Components in Tank 8D-1, and associated building
8. STS Bulk Underground Fuel Oil Tank (50D-09)
9. Tank 8D-1
10. Tank 8D-1 Support Structure
11. Tank 8D-2
12. Tank 8D-2 Support Structure
13. Tank 8D-3
14. Tank 8D-4
15. Waste Tank Farm Equipment Shelter and Condensers
16. HLW Tank Vaults
17. Tank Farm Underdrain system and Dewatering Well
18. Valve Pits