UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE STATE OF NEW YORK, et al.

Plaintiffs,

-vs-                                                        06-CV-810-JTC

THE UNITED STATES OF AMERICA, et al.,

Defendants.

---

The complaint in this action was filed on December 11, 2006, by the State of New York, the Commissioner of the New York State Department of Environmental Conservation ("NYSDEC"), and the New York State Energy Research and Development Authority ("NYSERDA") (collectively, "the State" or "plaintiffs"), against the United States of America and the Secretary of the U.S. Department of Energy ("DOE") (collectively, the "United States" or "defendants"), seeking cost recovery (First Cause of Action) and natural resource damages (Second Cause of Action) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and declaratory relief pursuant to the West Valley Demonstration Project Act ("WVDPA"), Pub. L. 96-368, 94 Stat. 1347 (1980) (Third Cause of Action), and the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270 (Fourth Cause of Action), in connection with the cleanup, maintenance, and decommissioning of the Western New York Nuclear Service Center at West Valley, New York ("West Valley Site" or "Site")).  Item 1.

On August 17, 2010, this court approved the entry of a Consent Decree in which the parties agreed upon a resolution of their respective financial responsibilities for cleanup, maintenance, and decommissioning of the Site, and agreed to dismissal without prejudice

—

of the claim for natural resource damages.   *See* Items 36, 37.   As a result, the first three causes of action in the complaint have been resolved, leaving only the State's Fourth Cause of Action requesting a declaration that the United States is responsible for any costs related to the ultimate disposal of the solidified high-level radioactive waste being stored at the Site.   *See* Item 1, ¶¶ 136-39.   Both parties have now moved pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss this claim for lack of subject matter jurisdiction.   Items 46, 50.

## BACKGROUND

The West Valley Site, located about 30 miles southeast of the city of Buffalo, New York, is the only commercial nuclear fuel reprocessing facility ever to operate in the United States.   From 1966 to 1972, the facility was operated by Nuclear Fuel Services, Inc. ("NFS"), a private contractor, under a license issued by the federal Atomic Energy Commission (now the Nuclear Regulatory Commission ("NRC")), and the New York State Atomic and Space Development Authority (now NYSERDA).   Activities at the Site included the recovery of uranium and plutonium from spent nuclear fuel[1] by means of a solvent extraction system which, by 1972 (when NFS ceased its fuel reprocessing operations), had resulted in neutralization and on-site storage of approximately 600,000 gallons of liquid high-level radioactive wastes–accompanied by unplanned releases of radioactive materials into the environment, workers' exposure to higher than expected levels of radiation, and

---

[1]As alleged in the complaint, the spent nuclear fuel came from several sources, including the federal government's defense program "N" reactor in Hanford, WA; military installations; commercial reactors; and other facilities under contracts which obligated the federal government to reprocess the spent fuel "in the absence of a commercial reprocessing capability.   Thus, the United States, either directly or indirectly, arranged for the reprocessing of all of the spent fuel reprocessed at the [Site]."   Item 1, ¶ 44.

highly contaminated facilities that had been used in the reprocessing operations. *See* Item 48 (Decl. of NYSERDA General Counsel Hal Brodie), ¶¶ 5-7; *see also Coalition on West Valley Nuclear Wastes v. Bodman*, 625 F. Supp. 2d 109, 111 (W.D.N.Y. 2007), *aff'd sub nom. Coalition on West Valley Nuclear Wastes v. Chu*, 592 F.3d 306 (2d Cir. 2009).

In 1976, NFS surrendered title to the Site to NYSERDA, and litigation ensued in this court regarding the terms and conditions of the agreements governing the operation, maintenance and responsibility for facilities used for reprocessing spent fuel and storage of radioactive waste. *See New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.*, 640 F. Supp. 1558, 1560 (W.D.N.Y. 1986) (Elfvin, J.) (referencing *New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.*, Civ. No. 81-CV-18E, and *Nuclear Fuel Services Inc. v. New York State Energy Research and Development Authority*, Civ. No. 81-CV-683E). In February 1982, the court approved a Settlement Agreement under which the State released NFS from liability under the agreements, in exchange for payment by the company of about $20 million. Item 48, ¶¶ 8-9.

Meanwhile, in 1980, Congress passed the WVDPA,[2] which directed the DOE to carry out a high-level radioactive waste management demonstration project at the West Valley Site. The project included solidifying the liquid high-level radioactive waste at the Site and transporting it to a yet-to-be-determined federal repository for permanent disposal. In accordance with the WVDPA, most of the high-level waste has been solidified as a glass composite through a "vitrification" process, and is currently being stored in 275 stainless-

---

[2]The text of the WVDPA is set forth in the note to 42 U.S.C. § 2021a.

steel canisters at the Site until a suitable federal depository can be constructed.  The WVDPA also required the DOE to enter into a Cooperative Agreement with the State under which the State was obligated to pay 10% and the DOE was obligated to pay 90% of project costs.  To date, the combined state and federal costs for cleanup of the West Valley Site total nearly $2.5 billion, with the State having spent over $300 million.  *Id.* at ¶¶ 10-12.

In 1982, Congress passed the NWPA to address the "national problem" created by the accumulation of spent nuclear fuel and radioactive wastes.  42 U.S.C. § 10131(a)(2).  The statute imposed primary responsibility on the federal government for the permanent disposal of spent nuclear fuel and high-level radioactive waste, to be accomplished by constructing a deep underground repository within a rock formation where wastes would be isolated from human contact, with disposal operations to commence "not later than January 31, 1998."  42 U.S.C. § 10222(a)(5)(B); *see also* 42 U.S.C. §§ 10101(18), 10131(b); *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 680 F.3d 819, 821 (D.C. Cir. 2012).  The NWPA required generators and owners of spent nuclear fuel and high-level radioactive waste to enter into disposal contracts with the DOE "not later than … June 30, 1983," 42 U.S.C. § 10222(b)(2)(A), and further provided that "the costs of such disposal should be the responsibility of the generators and owners of such waste" except that "[t]he costs resulting from permanent disposal of high-level radioactive waste from atomic energy defense activities shall be paid by the Federal Government." 42 U.S.C. §§ 10107(b)(2), 10131(a)(5).

In 1987, Congress amended the NWPA to direct the DOE to consider the suitability of only one site for the deep geological repository–Yucca Mountain, Nevada.  42 U.S.C.

§§ 10133, 10172.  Then, in 1995, the DOE issued a notice stating that it had "become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998 …," and that "the earliest possible date for acceptance of waste for disposal at a repository is 2010."  60 Fed. Reg. 21794 (May 3, 1995).  Several years later, in 2009, the DOE extended the projection to the year 2020, *see* 74 Fed. Reg. 3012 (January 16, 2009), and later in 2009, the DOE announced that Yucca Mountain was no longer a workable option for a repository.  Item 48, ¶ 15; *see Nat'l Ass'n of Regulatory Util. Comm'rs*, 680 F.3d at 822–23.  As a result, " '[a]t this time, there is not even a prospective site for a repository, let alone progress toward the actual construction of one.' "  *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, ___, 2013 WL 4081696, at *15 (2d Cir. Aug. 14, 2013) (quoting *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 474 (D.C.Cir. 2012)).[3]

Shortly after the passage of the NWPA, the DOE and NYSERDA commenced negotiations concerning their respective financial responsibilities for the West Valley Demonstration Project, including responsibility for the costs of permanent disposal of the

---

[3]In 2010, the Secretary of Energy, at the direction of President Obama, established the "Blue Ribbon Commission on America's Nuclear Future" to conduct a comprehensive review and recommend a plan of action for the management and disposal of the nation's spent nuclear fuel and high-level radioactive waste (referred to as the "back-end" of the nuclear fuel cycle).  *See* Memorandum of Jan. 29, 2010—Blue Ribbon Commission on America's Nuclear Future, published at 75 Fed. Reg. 5485 (Feb. 3, 2010).  In its January 2012 Final Report to the Secretary (available on-line at http://www.brc.gov), the Blue Ribbon Commission estimated that selection and evaluation of a deep geologic disposal site–still considered to be the only viable option for disposing of spent fuel and high-level nuclear waste–could take another 15 to 20 years.  In January 2013, in response to the Blue Ribbon Commission's report, the DOE issued a document entitled "Strategy for the Management and Disposal of Used Nuclear Fuel and High-Level Radioactive Waste" ("Federal Disposal Strategy") (available on-line at http://energy.gov/downloads/strategy-management-and-disposal-used-nuclear-fuel-and-high-level-radioactive-waste) stating that, "[w]ith the appropriate authorizations from Congress … [t]he Administration's goal is to have a [geologic] repository sited by 2026; the Site characterized and the repository designed and licensed by 2042; and the repository constructed and its operations started by 2048."  Federal Disposal Strategy at 2, 7; Item 48, ¶ 17.

high-level radioactive waste processed and stored at the Site.  As reflected in the correspondence attached to the materials submitted in support of plaintiffs' motion to dismiss, these discussions initially progressed under the parties' mutual understanding that the "perpetual care fund" established under the Cooperative Agreement between NYSERDA and DOE would be sufficient to cover the costs of final disposal of the West Valley high-level radioactive wastes, without the need to enter into the disposal contract required under the NWPA.  *See* Item 48, p. 14.  However, in October 1986, the DOE issued a "Report on Accuracy of Fees Paid by the Civilian Power Industry to the Nuclear Waste Fund," stating its position that since the West Valley waste "is owned by the State of New York and is all classified as commercial, although derived from both commercial and Government sources …,"  the waste could not be disposed of in a federal repository unless the State entered into a NWPA disposal contract with the DOE and paid a "one-time fee, estimated at $68.7 million."[4]  Item 48, p. 30.  In response, NYSERDA asserted its position that no disposal contract was required because the ultimate costs of permanent repository disposal were addressed by "the pre-existing provisions of the WVDPA and the Cooperative Agreement, specifically tailored to the unique nature and circumstances" of the West Valley wastes–namely, their source as reprocessed waste from atomic energy defense activities, for which the federal government bears disposal cost responsibility under the NWPA.  Item 48, p. 11.

Thus framed, the dispute over ultimate responsibility for the cost of permanent geologic repository disposal of the solidified high-level radioactive waste produced as the

---

[4]On February 5, 2002, Under Secretary of Energy Robert G. Card sent a letter to NYSERDA President William M. Flynn stating that, "[i]n the ensuing sixteen years, interest has increased the fee to over $228 million."  Item 48, p. 54.

result of the West Valley Demonstration Project became an insurmountable obstacle in the parties' ensuing negotiations, and the central focus of the State's remaining claim for declaratory relief in this action. Both parties have now moved to dismiss this claim pursuant to Fed. R. Civ. P. 12(b)(1), asserting separate and distinct grounds for the court's lack of subject matter jurisdiction.

The State contends that, when the complaint was filed in 2006, the DOE's most up-to-date projection was that a permanent federal repository might be available as early as 2010. In light of the parties' inability to reach agreement on disposal cost responsibility, the State found it necessary to plead the Fourth Cause of Action as a "protective claim" for a declaratory judgment that the United States is responsible under the NWPA for the costs of permanent disposal of the West Valley wastes, as contemplated by the WVDPA and the Cooperative Agreement. However, it has since become clear that siting of the repository, and permanent disposal of wastes there, will be delayed for an indefinite period of time, rendering the question of responsibility for the waste's disposal costs hypothetical, premature, and unripe for adjudication. Accordingly, the State seeks dismissal of the Fourth Cause of Action for lack of subject matter jurisdiction, on the ground of ripeness.

In response, the United States urges the court to deny the State's motion as procedurally improper. According to the United States, Rule 12(b) does not contemplate a motion to dismiss a claim brought by the party asserting the claim, and the court should therefore deem the motion to be a notice of voluntary dismissal under Rule 41(a) and dismiss the complaint without addressing the State's ripeness argument. In the alternative, the United States contends that the Fourth Cause of Action should be dismissed for lack of subject matter jurisdiction, not because it is unripe, but because jurisdiction over that

-7-

claim lies exclusively in the United States Court of Appeals under the special statutory

scheme prescribed by the NWPA.

## DISCUSSION

**I.       Rule 12(b)(1)**

"Determining the existence of subject matter jurisdiction is a threshold inquiry, and

a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison*

*v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, ___U.S.___, 130 S.Ct.

2869 (2010).   Because the question of ripeness is a jurisdictional issue, it is properly

considered on a motion to dismiss pursuant to Rule 12(b)(1).[5]  *See Duane Reade, Inc. v.*

*St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y. 2003) (citing *Auerbach*

*v. Bd. of Educ.*, 136 F.3d 104, 108–09 (2d Cir. 1998)).

"Ripeness is a justiciability doctrine designed to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a

concrete way by the challenging parties." *Connecticut v. Duncan*, 612 F.3d 107, 112 (2d

---

[5]The question whether plaintiffs properly seek dismissal of their own claim by filing a motion
pursuant to Rule 12(b)(1), as opposed to simply filing a notice of voluntary dismissal under Rule 41(a)(1)(I)
(obviating the need for a finding on ripeness), "need not be resolved here, as a court may address, *sua
sponte*, the question of subject matter jurisdiction at any time." *Boggs v. Die Fliedermaus, LLP*, 2004 WL
1554449, at *1 (S.D.N.Y. Jul. 7, 2004) (citing *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697,
700 (2d Cir. 2000) ("[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time
by a party or by the court *sua sponte*.")); *see also In re AE Liquidation, Inc.*, 435 B.R. 894, 901 (Bankr. D.
Del. 2010) ("While a plaintiff's dismissal of its own complaint for lack of subject matter jurisdiction is
unusual, courts are not precluded from considering jurisdiction under such a motion.").

Cir. 2010) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)), *cert. denied*, ___U.S.___, 131 S.Ct. 1471 (2011)).  At the heart of the ripeness inquiry is the question "whether [the court] would benefit from deferring initial review until the claims [the court is] called on to consider have arisen in a more concrete and final form." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). Thus, "[w]hen the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of [justiciability under U.S. Const. art. III, § 2, cl. 1]." *Auerbach*, 136 F.3d at 108–09.  The ripeness inquiry, therefore, "is 'peculiarly a question of timing' as cases may later become ready for adjudication even if deemed premature on initial presentation."  *Murphy*, 402 F.3d at 347 (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)).

Determining whether a claim is ripe for adjudication generally entails a two-fold inquiry, requiring the court " 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court considerations.' "  *Murphy*, 402 F.3d at 347 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 1498 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  The "fitness for decision" prong requires consideration of "the sensitivity of the issues presented and whether there exists a need for further factual development," while the "hardship to the parties" prong "injects prudential considerations into the mix," requiring the court to "gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined."  *Murphy*, 402 F.3d at 347.  "Both aspects of the inquiry involve the exercise of judgment, rather than the

application of a black-letter rule." *Nat'l Park Hospitality Assoc.*, 538 U.S. at 814 (Stevens, J., concurring).

"The 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008) (quoting *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003)). In making this determination, courts consider "several factors, including whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Ciba- Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986). "But when an agency decision may never have its effects felt in a concrete way by the challenging parties, the prospect of [court entanglement] in a challenge to such a decision is an element of the fitness determination as well." *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (internal citation and quotation marks omitted); *see also In re Aiken County*, 645 F.3d 428, 434 (D.C. Cir. 2011) (mandamus petition challenging (1) DOE's attempt to withdraw license application for construction of Yucca Mountain repository, and (2) DOE's policy announcement that it would abandon Yucca Mountain project, not ripe for adjudication), *subsequent order*, 2012 WL 3140360 (D.C. Cir. Aug. 3, 2012) (holding petition in abeyance pending further congressional action), *subsequent determination*, 725 F.3d 255 (D.C. Cir. Aug. 13, 2013) (granting mandamus directing NRC to continue with licensing process mandated by NWPA, in the absence of further congressional action).

As discussed above, in this case the underlying issue sought to be adjudicated by the State in its claim for declaratory judgment under the NWPA arose as a result of the

state and federal agencies' conflicting interpretations of the statutory, regulatory, and contractual provisions governing the apportionment of financial responsibility for permanent disposal of the high-level radioactive waste processed at the West Valley Site. At the time this action was brought in December 2006, the State had a reasonable basis for its belief that judicial resolution of this issue might be necessary prior to the year 2010, then projected to be "the earliest possible date for acceptance of waste for disposal at a repository …." 60 Fed. Reg. 21794. That projection has since been radically revised, and the information currently available to the court indicates that a site for permanent disposal of high-level radioactive wastes will not be constructed or made operational at least for several more decades, if at all.[6] As a result, the urgency underlying the State's protective request for declaratory relief has been supplanted by indefinite delay and uncertainty, rendering disposal cost liability an abstract issue at this time.

In light of these circumstances, it is clear to the court that adjudication of the State's Fourth Cause of Action would benefit from deferring review until the issues "have arisen in a more concrete and final form." *Murphy*, 402 F.3d at 347. While judicial resolution of the parties' legal obligations under the WVDPA, NWPA, and/or the Cooperative Agreement might become necessary at some point, any such resolution would be premature in the absence of a final determination by the DOE regarding acceptance of the West Valley wastes for permanent disposal at a federal repository–a determination which "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at

---

[6]Indeed, the Court of Appeals for the District of Columbia Circuit recently expressed its "considerable skepticism" as to whether a permanent facility can ever be built, "given the societal and political barriers to selecting a site …." *New York v. Nuclear Regulatory Comm'n*, 681 F.3d at 478.

all.' " *Devia*, 492 F.3d at 425 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal citation and quotation marks omitted)).

Significantly, the United States has identified no injury or hardship that either party would suffer if the court now declined to exercise its jurisdiction over the State's request for declaratory judgment regarding proper apportionment of responsibility for the costs of final disposal of the West Valley wastes.  Indeed, the United States agrees that the court lacks subject matter jurisdiction over the dispute, albeit on different grounds,[7] and has declined to take a position on the merits of the State's ripeness argument.  Item 50-1, p. 2 n. 2.  In the absence of any stated objection to dismissal on ripeness grounds, and considering the significant likelihood that future congressional action implementing the Federal Disposal Strategy (*see* n. 3, *infra*) could have further, unanticipated impact on the cost responsibility issue (including the possibility of rekindling stalled mediation efforts that might obviate the need for the court to engage in the difficult process of finding facts within the special province of the administrative agencies party to this action), this court should "avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of … issues that time may make easier or less controversial."  *Duncan*, 612 F.3d at 114 (quoting *Simmonds*, 326 F.3d at 357).

---

[7]The United States contends that the court lacks jurisdiction over the State's remaining claim because the NWPA vests the federal courts of appeals with "original and exclusive" jurisdiction over any civil action arising under that statute's fee provisions.  *See* Item 50-1, pp. 8-11 (citing 42 U.S.C. § 10139(a); *Gen. Elec. Uranium Mgmt. Co. v. U.S. Dep't of Energy*, 764 F.2d 896, 901 (D.C. Cir. 1985). The State responds that the statute's exclusive circuit court jurisdiction is reserved for actions challenging final agency action.  The court declines to reach the issue regarding the scope of the NWPA's civil jurisdiction provision, however, because established precedent recognizes that a district court has the discretion to consider dismissal "on certain threshold issues [including ripeness] prior to addressing subject matter jurisdiction."  *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 922 F. Supp. 2d 445, 455 (S.D.N.Y. 2013) (citing *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *Tenet v. Doe*, 544 U.S. 1, 6 n. 4 (2005); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999)).

Under all of these circumstances, including the inescapable underlying fact that there will be no disposal of wastes in a permanent deep underground federal repository for at least several decades, it is beyond dispute that any judicial determination of the State's claim for declaratory relief regarding the parties' financial responsibility for disposal of the West Valley high-level radioactive waste would be hypothetical and premature, until final administrative action has been taken on the matter and its effects felt by the parties in a concrete way.  Accordingly, the court grants the State's motion to dismiss without prejudice the Fourth Cause of Action, on the ground that it is unripe for adjudication.

## CONCLUSION

For the foregoing reasons, the court finds that the Fourth Cause of Action seeking declaratory judgment as to the parties' responsibility costs related to the ultimate disposal of the solidified high-level radioactive waste being stored at the West Valley Site is not ripe for adjudication.  The State's motion (Item 46) to dismiss this claim is therefore granted, and the action is dismissed in its entirety, without prejudice.

The United States' motion to dismiss (Item 50) is denied to the extent it seeks a ruling on alternative grounds.

The Clerk of the Court is directed to take appropriate steps to close the case.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:    November 20, 2013
p:\pending\2006\06-810.nov20  .2013

-13-